CLINTON WYATT *v.* STATE ROADS COMMISSION
[No. 75, October Term, 1938.]

*Decided Sept. 29th, 1938.*

The cause was argued, as of the April Term, before BOND, C. J., URNER, OFFUTT, PARKE, and MITCHELL, JJ.

*R. E. Lee Marshall* and *Paul F. Due,* for the appellant.

Thomas M. Jenifer, Special Assistant Attorney General, William L. Rawls, and William L. Marbury, Jr., for the State Roads Commission, appellee.

J. Purdon Wright, counsel for the Public Service Commission, filed a brief as amicus curiae.

Samuel H. Feldstein, Edgar Turlington, Thomas F. Barry, Marvin Klass and Roberts & McInnis, counsel for the Maryland Bay Company filed a brief as amici curiae.

BOND, C. J., delivered the opinion of the Court.

A taxpayer, in this suit, contests the constitutionality of an Act of 1937, chapter 356, looking to the construction of new bridges, and the legality of refunding measures of the State Roads Commission under the authority of an act adopted immediately prior, chapter 355. The case was argued and submitted below on a bill for an injunction to restrain proposed action under the statutes, and an answer to that bill. The court held none of the objections well founded, and dismissed the bill; and the complainant appeals.

Chapter 356, adding eighteen new sections to article 89B of the Code, title "State Roads," to follow immediately after section 104, provides for construction or other acquisition of highway bridges and tunnels to overcome disadvantages from separation of parts of the state by its broad waterways, the cost to be paid by the issue of revenue bonds payable exclusively from tolls to be charged on the bridges and tunnels, and appropriated to that purpose. Both in the statute and in the form of bonds determined on, it is declared repeatedly that they are to be so payable, and shall not constitute a debt or obligation of the State. "The issuance of revenue bonds under the provisions of this sub-title shall not directly or indirectly or contingently obligate the State to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment." Section 107. These words are repeated in the form of bond.

The State Roads Commission is required to build any new bridges or tunnels resolved upon by it, and in section 113 it is provided that by resolution or trust indenture of that body prior to the issue of the bonds it might covenant "to pay the cost of maintaining, repairing and operating any project or projects constructed or acquired under the provisions of this sub-title, and, inasmuch as such project or projects will at all times belong to the State, such resolution shall have the force of contract between the State and the holders of the bonds issued for such project or projects."

The commission is authorized to fix the tolls, and to revise them from time to time, but so fixing and adjusting them as to provide a fund sufficient with any other revenues from the projects to pay the cost of maintenance if that should be left payable from tolls, and the bonds and interest as they should become due. A sinking fund for future financing in connection with the bonds is provided for. There was, accordingly, no provision for resort to taxation for any outlay on the projects authorized.

Plans for carrying highways across or under the State's waterways have been considered for a number of years, and one of the questions now raised is on the possibility of conflict with provisions made for a previous plan, under which nothing has been done. The 1938 plan, authorized by the statute now considered, is a comprehensive one, deemed feasible with the aid of funds offered by the Federal Government. Three bridges, forming together a highway from Virginia to the north of the Susquehanna River, and a bridge across the Bay, were resolved upon by the State Roads Commission, a bridge across the Potomac River, below Washington, one across the Patapsco at Baltimore, one across the Susquehanna River to replace an old bridge between Havre de Grace and Perryville, and one across the Bay at one of two designated sites. Permission of Congress for these crossings was granted in an Act of April 7th, 1938 (52 Stat. 205), upon the condition that tolls which might be charged to pay

the cost of construction and maintenance should be reasonable, and in no event should continue beyond forty years.

The Federal Government having announced its plan to aid projects by its Emergency Administration of Public Works to the extent of forty-five per cent of the cost, the State Roads Commission made application for this aid for the three bridges planned, and duly resolved to proceed with the plan so aided. It resolved to issue revenue bonds under a trust indenture as the act permitted, but only to defray cost. The cost of maintenance and operation was undertaken by the commission itself by its resolution, under the authority of section 113.

The present bill of complaint seeks an injunction, generally, against any action under the authority of the statute, chapter 356, and specifically against constructing the bridges, proceeding with the application to the Federal Government, issuing the revenue bonds, pledging the tolls, exercising a power to condemn, actually charging the tolls, and also against proceeding with a refunding plan under chapter 355.

It is questioned whether the statute, (chapter 356) was enacted in compliance with the constitutional requirement, article 3, section 27, that no bill shall "become a law until it be read on three different days of the session in each House, unless two-thirds of the members elected to the House where such bill is pending shall so determine by yeas and nays." The complaint is that in the House of Delegates the three readings of this bill occurred on one and the same calendar day, although not all on the same legislative day, and occurred without the necessary suspensions of rules. The facts appear to be that all three readings occurred on April 5th, 1937, but that the House, on Saturday, April 3rd, took a recess until the following Monday, and on Monday resumed the unfinished session of April 3rd, until an adjournment in the afternoon, and then met next as of April 5th. During the resumed session of April 3rd, the bill was received from the Senate, and referred to a committee, and during the same

session the rules were suspended to receive the report, according to entries in the Journal; but there is no entry of suspension for the separate, additional purpose of the second reading. The second reading was had, and the bill passed to the third reading and its passage on the session of April 5th.

A distinction between legislative days as "days of the session," and calendar days, has long been observed in parliamentary practice, before the adoption of the present Maryland Constitution, and ever since, and the court is of opinion that continuation of the practice must be presumed to have been contemplated by the draftsmen of the Constitution. "A contemporaneous construction placed upon a particular provision of the organic law by the legislative department of the government, acquiesced in and acted upon without ever having been questioned * * * furnishes a very strong presumption that the intention is rightly interpreted." *Trustees of the Catholic Cathedral Church v. Manning,* 72 Md. 116, 130, 19 A. 599, 603.

The objection that there was no suspension of rules for the second reading as well as for reception of the committee report, is one which may rest on clerical entries rather than on actual occurrences, and the observations of the court in *Thrift v. Towers,* 127 Md. 54, 61, 95 A. 1064, seem especially appropriate. On so narrow a question, the presumption of adherence to the constitutional requirements should prevail over the mere form of the clerk's entry.

The principal question in the case is whether the issue of revenue bonds under the enactment as described would amount to contracting a debt without annual taxation to meet it, as required by the State Constitution in article 3, section 34: "No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debts as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same." In

view of the decision in *Bonsal v. Yellott,* 100 Md. 481, 60 A. 593, on the meaning and purpose of this section of the Constitution, it might be necessary to consider, if the decision were not controlled by other considerations, whether a debt for a highway bridge would be within the purview of it; but this is not found necessary.

Objections to the policy of resorting to "self-liquidating" improvements, as they have been called, have been cited, and we must assume they were duly considered by the General Assembly in this instance so far as they might have force. They are to be weighed and disposed of by the legislative branch of the State Government, in the exercise of its plenary power, and the courts have only to deal with argued limitations on that power, to be found in some provision of the Constitution. "Whatever the people have not, by their Constitution, restrained themselves from doing, they, through their representatives in the legislature, may do." *Tranter v. Allegheny County Authority,* 316 Pa. 65, 75, 173 A. 289, 294; *Kenneweg v. Allegany County,* 102 Md. 121, 62 A. 249.

As has been seen, in the present enactment itself, chapter 356, any obligation on the State to repay principal or interest has been excluded, and so it is in the form of bonds to be issued under it. This was the clear intention, emphatically expressed. Whatever elements of contract by the State, or debt, might be thought to exist in the arrangement, clearly, so far as the cost of construction is concerned, there is no contract to add to the burden of the taxpayers of the State present or future, none to pay anything out of taxes, and no debt incurred for which taxes could be levied. And that is the one kind of debt with which the constitutional clause deals. There is no novelty in the arrangement for self-paying construction. And it has long been settled that by use of the device no public debt within the meaning of constitutional safeguards and restrictions is incurred. *Simonton, Municipal Bonds,* sec. 59; 1 *Dillon Municipal Corporations* (5th Ed.) sec. 198; 6 *McQuillin, Municipal Corporations* (2nd Ed.) sec. 2389. Analogies in some respects may be found in the charters

of toll roads or turnpikes, which were public roads of a higher quality than were otherwise obtainable at the time, procured by franchises to collect tolls for the cost of construction and maintenance. I *Elliott, Roads & Streets* (4th Ed.) secs. 79 and 80; *Douglas v. Turnpike Road Co.*, 22 Md. 219, 238; *Washington & Baltimore Turnpike Road v. State*, 19 Md. 239.

The case is not one in which property or income already existing and owned by the State is to be applied to repayment of the cost. The special fund of tolls to be created is an entirely new one, to be borne of the subscriptions to the bonds. By means of the grant of tolls the State is to acquire at once new public highways. The case of *Mayor etc. of Baltimore v. Gill*, 31 Md. 375, is cited as an authority for a conclusion that the issue of the bonds would constitute the contracting of a debt for which taxes should be provided under the constitutional clause. It was a case in which stock previously owned was to be pledged to raise money for an investment in railroad stock, but pledged with a stipulation that the lenders should look to the pledged stock alone for repayment, and the pledge was made without compliance with constitutional requirements for creation of a municipal debt. The court decided that the pledge of the existing property was indistinguishable, within the purview of the applicable constitutional clause, from a pledge of credit, and held it the creation of a debt. That is in accordance with the weight of authorities, if not with a unanimous conclusion of them. 1 *Dillon Municipal Corporations* (5th Ed.) sec. 199; Review of decisions 72 *A. L. R.* 695, 96 *A. L. R.* 1393. The action dealt with is not that now questioned, and the decision of that case does not control the decision of this one.

There is a large volume of cases which have decided that no debt, in the constitutional sense, is created by issues of bonds payable out of revenues, only a very few courts having come to a contrary conclusion, and some of those courts having subsequently adopted the view of the majority. See studies in 43 Yale Law Journal, 924,

953; 4 Fordham Law Review, 12; 47 Harvard Law Review, 688; and 84 Univ. of Pa. Law Review, 555.

It has been argued that resort to the device is a circumvention of the constitutional purpose, but the courts are not warranted in adding prohibitions to constitutional provisions, beyond those formulated and adopted by the framers. Only the one specific restriction on the Legislature was adopted to guard against improvidence and bad financing, and restraint beyond that was left to the General Assembly itself. The Assembly was given the chief part of the task of deciding questions of financial policy, and if the courts should govern their decisions on constitutional questions by their views of what was and what was not wise beyond the limitations expressed, they would be usurping functions. And even if the courts were warranted in extending the effect of provisions to carry out supposed general purposes, they would not be warranted in doing it to prevent an action of the legislative branch so long and so widely approved as has been this restort to self-liquidating arrangements to procure new improvements.

The burden of paying the cost of maintenance, repair and operation, which the State Roads Commission contracts to undertake, is objected to as unconstitutional under the same clause requiring the contracting of a debt to be accompanied by a law providing for taxes to pay the interest and principal. Article 3, section 34. But the bridges are to belong to the State from their beginning, and in this the State undertakes only its ordinary function with regard to its highways, to be paid for as a current expense of government. If it should buy or build a bridge, paying for it at once from money in the treasury or money borrowed as usual, it would take up this duty of maintenance, repair, and operation at once from its current funds, and, however great the burden might appear to be, it would not be said that a debt in the constitutional sense, that sort of debt which caused the insertion of this constitutional clause, had then been contracted. The added element of contract with the bondholders would

add nothing to the State's ordinary burdens. The effect of it is only to relieve the tolls fund of a charge by meeting it as usual as a current outlay of government, and presumably to relieve the travelling public of some measure of tolls. 1 *Dillon, Municipal Corporations* (5th Ed.) sec. 196; *Simonton, Municipal Bonds*, sec. 59; *Smith v. Dedham,* 144 Mass. 177, 10 N. E. 782.

The Constitution does not prohibit all burdens or require all contracts of the State, to be accompanied by laws for levies of taxes to meet them. It deals with burdens of a kind. And an undertaking to pay undetermined, undeterminable, amounts of the cost of maintenance, repair, and operation in the future from day to day, month to month, and year to year, as need arises, if it can be classed as containing an element of debt at all, is not one for which taxes to pay interest and principal, and to pay the principal completely in fifteen years, might be provided in a tax law. There can be no principal and interest in such a contract obligation. If it should be met out of the general road maintenance funds it would be, more exactly, a contract for maintenance, work, and labor. No money at the outset will be owed to any one. Money can become payable only to various persons, at various times, in various amounts, as may be called for by future conditions in the bridges. However heavy the burden might possibly become, the contract to carry it is not such a debt with principal and interest as is dealt with by the Constitution. Whatever debt there might be, would be a debt of the future, and the contract would fall in with the distinction between a debt and a contract to incur future debts. According to all decisions known to us, even if ascertained amounts are now agreed to be paid in the future, as, for instance, rentals, this would not be the contracting of a debt in the constitutional sense. "There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise." *City of Walla Walla v. Walter Co.,* 172 U. S. 1,

20, 19 S. Ct. 77, 85, 43 L. Ed. 341; 1 *Dillon, Municipal Corporations* (5th Ed.) sec. 196.

The constitutionality of committing to the State Roads Commission the collection and disbursement of the tolls funds is contested. Sections 2 and 3 of article 6 of the Constitution make provision for the superintendence of the fiscal affairs of the State, with the collection and disbursement of its taxes and revenues, by the State Comptroller and the Treasurer, while under the statute now in question the State Roads Commission is to sign the bonds, with the countersignature of the Comptroller, is to see to the proper deposit of the funds, which are made trust funds, and is to disburse them in fulfilment of the special purpose for which they are to be created. Does that arrangement violate the constitutional provisions? The court is of the opinion that it does not. The fund from tolls will be one coming into existence only for the special, peculiar, application to the bonds, and is completely appropriated to that purpose; and nothing more than a medium of collection and transmission is required. The State will have no right to the fund, and it would be a misapplication to put it into the ordinary channels for state revenues. The sections of the Constitution cited are not intended to deal with a fund so completely appropriated to outside persons.

One of the bridges resolved upon, that over the Patapsco River, would be within the limits of Baltimore City, and it is questioned whether the taking over of the construction, ownership and management by the State is consistent with the Home Rule Amendment to the Constitution, article 11A. Regularly, under its charter, the city controls the opening and management of highways within its limits, and also controls the erection of structures about the harbor. The statute in question would not interfere with any municipal action with reference to such streets or structures as would ordinarily come within its exclusive regulation, but would project through its area a new highway which is designed to be part of an artery running through the whole State, north

and south, and into the State of Virginia. This, we think, is, within the meaning of the Constitution, a general State provision as contrasted with a local one; and what the Constitution prohibits is the passage by the State Legislature of a local law on a subject covered by the city's expressly granted powers. Constitution, art. 11A, sec. 4; *Ness v. Supervisors of Elections of Baltimore,* 162 Md. 529, 535, 160 A. 8.

By chapter 330 of the Acts of 1935 (Code [Supp. 1935] art. 89 B, sec. 85, etc.) the General Assembly created a "Chesapeake Bay Authority," to erect a bridge across the bay from Miller's Island, at the north side of the mouth of the Patapsco River, to Tolchester on the Eastern Shore. Construction was to begin in two years from June 1st, 1935, or the authority to build was to cease. Acts 1935, ch. 109, sec. 54. The Authority was given a life of ten years and until all its obligations should be met. And there was a provision excluding the construction and operation of a bridge or ferry across the bay within a distance of twenty miles, before bonds to be issued to pay for the erection should be fully met and discharged. An express agreement on the exclusion was made by the State in the enactment. But the Miller's Island bridge, as is conceded in the case, has never been begun, and the two years allowed for the beginning have elapsed. No bonds for that bridge have been issued. A sufficient answer to the question now raised lies in the fact that the Authority set up for the construction was a purely State agency, subject to alteration of its powers, even extinction, by the State, so long as no rights of others by contract with the Authority have intervened. In so far as the provisions under the Act of 1937 may be inconsistent with those of the Act of 1935, the former must now be regarded as superior, and not affected by the latter. *Joesting v. Baltimore,* 97 Md. 589, 55 A. 456; *Kelly v. Consolidated Gas Co.,* 153 Md. 523, 138 A. 487; *Thomas v. State,* 173 Md. 676, 681, 197 A. 296.

In order to remove some earlier charges on tolls, represented by issues of a total of $5,516,000 in bonds, pro-

vision was made in an Act of 1937 chapter 355, for the issue of refunding bonds in the same total amount, but bearing interest at a lower rate. There would be uncertainties in the amounts necessary to be paid to redeem the older bonds. Their redemption dates differ, and as the Act, chapter 355, provided for issue at once of the total amount of bonds authorized, the possibility of payments of interest on the two issues of bonds, in part, creates one uncertainty, and uncertainty would exist as to the amount to be realized from the sale of the refunding bonds. Of the older bonds $408,000 have already been redeemed. And in anticipation of the uncertainties to be met, the Commission has decided to issue the total of $5,516,000 of refunding bonds, and thus to hold some or all of the $408,000 applicable to the actual needs in the refunding, and, if finally necessary, to use a reserve fund of $220,-000 previously provided for the older bonds. It is objected, first, that chapter 355 commands that refunding bonds be issued in only the exact total principal sum of the older bonds to be refunded, and that the issue of the $408,000 would be illegal. An injunction against it is prayed. But the court does not find any express denial of this latitude to the Commission, and considers that a sensible construction of the legislative purpose would include it. The only purpose is to retire the older bonds, and the ordinary, appropriate, means for this would seem available within the limits of the Act. Of course, if the Commission should undertake to apply the $408,000 to some purpose outside of the statute, an injunction might then be proper, but none would be in place now to restrain the use described.

Acts of 1933, for the issue of the older bonds, contained a provision for creating a reserve fund of $220,-000 to secure payment of them, with the interest, in case the fees and special taxes primarily appropriated should prove insufficient. Acts 1933, ch. 463 (Code [Supp. 1935] art. 89B, sec. 74), 1933 Spec. Sess. ch. 93 (same section). And an injunction is sought to restrain the Commission's using that fund, if necessary, to complete the refunding

of the bonds it was designed to secure. The fees and special taxes, it is complained, have not proved insufficient for the purpose of paying principal and interest on them. As it is presented, the question is one of authority to use the fund to refund or redeem the last of the bonds, after which there would be none to be secured by it, and the court does not see that it is a question ripe for decision now. When the last refunding occurs there may be no need of resorting to funds other than those primarily available for the purpose, and meanwhile circumstances may alter, and the problem may alter with them. It will not be anticipated; the point will be passed undecided.

*Decree affirmed, with costs.*

OFFUTT, J., filed an opinion as follows, concurring in the result.

I am unable to agree with so much of the majority opinion as decides that the State Roads Commission may validly assume in perpetuity the following obligation, which in the second paragraph of its Resolution of September 9th, 1938, it attempts to reserve the power to undertake: "the cost of maintaining, repairing and operating said bridge shall be paid from funds of the State Roads Commission applicable to the maintenance of state roads and highways in the event the State Roads Commission shall hereafter determine that it is not practicable to pay for the same out of revenues from tolls and other sources."

The effect of such an obligation on its face value would be to bind the State to take over the whole burden of operating, maintaining, and repairing any bridges constructed in connection with the project, in perpetuity, if it should prove to be a financial failure. I say in perpetuity, because there is no estimate, nor can there be one, of the probable revenue from tolls. If they prove insufficient to pay the interest and principal of the revenue bonds, the liability of the State could not end. That the obligation may impose upon the State heavy expenses is obvious.

Should the bridges be destroyed or damaged by ice or storms, or become dangerous because of defects in structure or design, under the resolution they may at the option of the State Roads Commission be repaired at the expense of the State. The State Roads Commission may also assume the expenses of collecting the tolls and operating the bridges.

It is true that the power of the State Roads Commission to bind the State in perpetuity by a contract to dedicate a part of its general funds to the repair, operation and maintenance of the bridges and approaches is not necessarily involved in this case, because it may be assumed, though not so expressed in the resolution, that all obligations assumed therein are subject to the implied condition that the State may at any time amend or repeal the statute on which the resolution rests. *Wabash R. Co. v. Defiance*, 167 U. S. 88, 93, 17 S. Ct. 748, 42 L. Ed. 87; *Louisville & N. R. Co. v. Mottley*, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297 (passes). Referring to bargaining away legislative power, it is said in *Norman v. Balto. & O. R. Co.*, 294 U. S. 240, 55 S. Ct. 407, 416, 79 L. Ed. 885; "Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. See *Hudson County Water Co. v. McCarter*, 209 U. S. 349, 357, 28 S. Ct. 529, 52 L. Ed. 828. This principle has familiar illustration in the exercise of the power to regulate commerce. If shippers and carriers stipulate for specified rates, although the rates may be lawful when the contracts are made, if Congress through the Interstate Commerce Commission exercises its authority and prescribes different rates, the latter control and override inconsistent stipulations in contracts previously made. This is so, even if the contract be a charter granted by a State and limiting rates, or a contract between municipalities and

carriers. \* \* \* Applying that principle, the court held that a contract, valid when made in (1871) for the giving of a free pass by an interstate carrier, in consideration of a release of a claim for damages, could not be enforced after the Congress had passed the Act of June 29, 1906, 34 Stat. 584 (U. S. Code Ann. title 49, par. 1)."

Nevertheless, since a possible purpose of this litigation is in aid of the merchantability of the revenue bonds, good faith with possible purchasers requires that that limitation on the power of the State Roads Commission should be announced at this time, as a consequence of interpreting the Commission's offer, which this court is required to construe.

The present litigation leaves open such important questions as the sufficiency of the title to chapter 356 of the Acts of 1937, and whether the Legislature may lawfully delegate to the State Roads Commission the power to decide whether it will obligate the State in perpetuity to dedicate its road and bridge funds to the maintenance, operation, and repair of units of the project. Since those questions are not raised in this case and since the objections which are raised are in my judgment untenable, subject to the limitation stated I concur in the affirmance of the decree appealed from.