CASTLE FARMS DAIRY STORES, INC. ET AL. *v.*
LEXINGTON MARKET AUTHORITY ET AL.
(Six Appeals in One Record)

[No. 34, October Term, 1949 (Adv.).]

474

476

*Decided June 28, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*R. Samuel Jett* for the Goetze Pickle, Co., Inc.

Robert E. Couglan, Jr., with whom were Paul B. Mules and I. Harold Hammerman on the brief, for Irvin G. Courtney, et al.

W. Frank Every, with whom was J. Purdon Wright on the brief, for Edna Henning, et al.

Submitted on brief by Paul F. Due, Harry S. Kruger and Due, Nickerson & Whiteford for Castle Farms Dairy Stores, Inc.

Submitted on brief by R. Palmer Ingram for Walter C. Kaufman, Sr., et al.

Paul F. Due, with whom were Harry S. Kruger and Due, Nickerson & Whiteford on the brief, for Sarah Torosino, et al.

J. Cookman Boyd, Jr., for the Lexington Market Authority and its members individually.

MARKELL, J., delivered the opinion of the Court.

These are cross-appeals from a decree (a) holding the Lexington Market Authority Act, (Acts of 1945, ch. 863), constitutional, (b) declaring all rights and interest of all persons, by claim, direct from the City or indirect through others, of ownership, right of occupancy, tenancy, possession, lease, sublease, permit, license or otherwise, in and to any market stalls in the part of the Market which was destroyed by fire on March 25, 1949, to have ceased and no longer to exist, and (c) reserving for further decision all rights of claimants in respect of stalls in the part of the Market not so destroyed by fire. The bill, for injunction and a declaratory decree, was filed or adopted by original and intervening plaintiffs, as taxpayers and "owners" of stalls or claimants of other interests in stalls, in the burned and unburned parts of the Market, against the Authority and the City. Plaintiffs appeal from the whole decree, the Authority from the part above referred to as (c).

By the Act the Authority, "a body corporate and politic", is created, and is to be "deemed an instrumentality" of the City and a "public corporation". The members are to be appointed by the Mayor. When all revenue bonds issued pursuant to the Act shall have been paid and retired, the Authority shall close out its business and affairs and all its property shall revert to the City. The Authority has power to acquire from the City "the whole or any part of the existing market" at an agreed purchase price, to erect, remodel, extend, improve, equip, operate and maintain the Market, to acquire by purchase or condemnation real property or rights or easements therein or franchises or licenses, and if the Authority shall deem it expedient to establish the Market on any lands, streets or public places title to which shall be in the City, the City is authorized to convey title to the Authority upon payment of the reasonable value of such lands, to be determined by the Authority and the City Council. The Authority has power to borrow money and issue revenue bonds payable solely from earnings of the Market. The City is authorized and empowered to convey to the Authority the existing market or any part thereof upon receipt of the purchase price, and to vacate any streets or other public places required to insure proper operation of the Market, and may grant to the Authority the exclusive right to use such vacated streets or other public places for the purpose of the Market subject to such terms and conditions as the City and the Authority may lawfully agree upon. Revenue bonds issued under the Act shall not be deemed to constitute a debt of the City or a pledge of its faith and credit, but such bonds shall be payable solely from the funds of the Authority from revenues of the Market. All such bonds shall contain a statement on their face that the City is not obligated to pay such bonds or the interest thereon. The issuance of such bonds shall not directly or indirectly or contingently obligate the City to levy or pledge any form of taxation whatever or to make any appropriation for their payment.

Section 7 of the Act provides: "(Rights of Present Stallholders.) In the operation of the Market the Authority shall preserve, to the extent required by law, all rights of any persons in or to any of the stalls now located in the existing market, and shall give first choice as to location in the rental of stalls in the Market to the present tenants of stalls in the existing market."

The Authority may at one time or from time to time provide for issuance of its revenue bonds for the purpose of paying all or a part of the cost of the Market. It may secure its bonds by a trust indenture, which "may pledge or assign all revenues to be received from the Market, but shall not convey or mortgage the Market or any part thereof." The Authority may "fix and revise from time to time rates or charges for the use of the facilities of the Market, including parking facilities." "Such rates or charges shall be so fixed and adjusted as to provide a fund sufficient with other revenues of the Market, if any, to pay (a) the cost of maintaining, repairing and operating the Market * * * and (b) the bonds and the interest thereon * * *. Such rates or charges shall not be subject to supervision or regulation by any other State or City commission, board, bureau or agency". The Market and the bonds of the Authority and the interest thereon shall be and remain forever exempt from all state, municipal and local taxation.

It appears that Lexington Market was planned before the City of Baltimore was incorporated, but the first building was constructed early in the Nineteenth Century. On March 25th, 1949 a substantial part of the existing market was destroyed by fire; the structure in the bed of Lexington Street, between Eutaw and Paca Streets, was destroyed, the structure between Paca and Greene Streets remains. Before the fire the market yielded the City no net income, but was operated at a loss.

On March 30th, 1949 the Authority adopted a resolution (or skeleton of a resolution) which recites that the Authority has heretofore carefully considered the studies

and findings of a Committee appointed by the Mayor to study the legal, financial, architectural, engineering and general community problems involved in the improvement of the Lexington Market Area and has employed its own consulting engineers and architects, financial experts, surveyors and attorneys, and caused investigations, surveys and estimates to be made, and a plan prepared for the alleviation of traffic conditions in and around the area, and a more economical and productive use of such area, by the construction of a modern, sanitary and accessible metropolitan market, including parking garages and utilizing the existing market and certain additional areas deemed necessary and advisable in connection with the plan; the Board of Estimates of the City has heretofore [before the fire] approved [the City says, not finally, but tentatively, subject to such ordinances of the Council as may be necessary] payment of $100,000 by the Authority to the City, as the purchase price of the existing market; according to the plan and estimates prepared by the Authority's consulting engineers and architects in relation to the establishment and construction of a "Market", including the "existing market", and the construction of necessary buildings, structures, facilities and properties for use in connection with the buying, storing, refrigerating, processing and sale of food products, and including parking and other ancillary facilities, the sum of $————— will be sufficient to pay the cost of such market; and "by reason of the recent disastrous fire destroying the existing market, it is imperative that the Authority proceed immediately with the establishment and construction of such Market in accordance with said plan and estimates." By the resolution the Authority determined that: 1. The immediate establishment and construction of the Market in accordance with the Authority's plan is desirable and in the public interest and necessary to protect the public health and safety of the citizens of Baltimore, and the establishment and construction thereof will alleviate traffic congestion in and around the Market area. 2. The

construction of such Market is hereby authorized, it shall be constructed and paid for under the supervision and approval of the Authority's consulting engineers, and the cost shall be financed as hereinafter provided. 3. To provide funds for paying the cost of the Market, including the purchase price of the existing market, the issuance of revenue bonds of the Authority in such aggregate principal amount and bearing such rate or rates of interest as may be hereafter determined by it, is hereby authorized. The bonds shall be secured by a trust indenture, which "shall pledge and assign the revenues to be received from the Market but shall not convey or mortgage the Market or any part thereof." 4. The cost of maintaining, repairing and operating the Market and the payment of the principal of and interest on the revenue bonds authorized shall be paid out of the revenues from the use of the facilities of the Market. 5. The bonds shall be in substantially the form set out in the resolution. 6. The Authority shall hereafter fix the rates to be charged for the use of the Market or of any of the facilities thereof.

The City says it intends to incorporate in the deeds conveying to the Authority lands now owned by the City a provision or limitation that the lands shall not be subject to execution or attachment for the debt of the Authority, and that in the event a receiver or trustee in bankruptcy is appointed to operate the market, he may use the land conveyed, but neither he nor anyone else shall have power to alienate the land or divert it from use as a market; and that in the event any court shall decree a sale of the Authority's property for the benefit of bondholders, or for any other cause, the title shall revert to the City free of all claims or liens whatsoever.

The Authority's plans contemplate replacement, by very different buildings, of all the buildings, burned or not burned, of the old market. At the argument it was stated that in the Market, as planned, the stalls, in number and substantialy equivalent space, will more than equal those in the old market before the recent fire.

Judge Sherbow in his opinion vividly sketches the history of Lexington Market, its physical deterioration, unsanitary condition and traffic problems, which long before the fire made radical reconstruction necessary. We need not elaborate these facts, for they are not disputed and, if they were, could not affect our decision. If the Act is unconstitutional, urgent need would not justify an unlawful method of satisfying the need. On the other hand, if the Act is constitutional, we could not usurp the province of the legislature and the City by deciding that some more common method of dealing with the situation would be better. *Wyatt v. State Roads Commission*, 175 Md. 258, 265, 1 A. 2d 619.

If the Act is unconstitutional, the project is unlawful, and even though the City would not be obligated for the project, it presumably would incur some expense or loss in extricating itself and its property. As taxpayers, therefore, plaintiffs, are entitled to sue to enjoin such an unlawful project. *Matthaei v. Housing Authority*, 177 Md. 506, 610, 9 A. 2d 835. As owners and claimants of rights in the market, they may also, in the same case, sue to protect their property rights. *Green v. Garrett*, 192 Md. 52, 63 A. 2d 326, 328. The conflict between any rights of plaintiffs in the market and their interests as taxpayers shows the artificial character of this suit, but does not bar it.

Plaintiffs attacked the constitutionality of the Act on various grounds, some of which have been abandoned in this court and will not be mentioned. They still contend that the Act is unconstitutional because: (*a*) in giving the Authority power to fix market rates, it deprives stall-holders of property without due process, in violation of Art. 23 of the Declaration of Rights; (*b*) it violates Art. 11, sec. 7 of the Constitution by authorizing creation of a debt by the City without compliance with the constitutional requirements; and (*c*) it violates the Home Rule Amendment, Art. 11A.

In disposing of a contention of eminent counsel against the constitutionality of a municipal annexation act, the

Supreme Court, by Mr. Justice Moody, once said, "It is difficult to deal with a proposition of this kind except by saying that it is not true." *Hunter v. Pittsburgh*, 207 U. S. 161, 177, 28 S. Ct. 40, 46, 52 L. Ed. 151. Manifestly the present Act does not deprive stall-holders of rights without due process, because in section 7 it expressly provides that all such rights, if any, shall be preserved. In *City of Baltimore v. Wollman*, 123 Md. 310, 317-318, 91 A. 339, this court construed an ordinance as giving power to fix only rates not fixed by contract. In other words, a reservation of vested rights was implied. In the present Act the reservation is not implied but expressed.

In no literal or direct sense does the Act authorize creation of a debt by the City, for it expressly provides, as plainly as words can provide, that the Authority's revenue bonds shall not constitute a debt of the City or a pledge of its faith and credit, but shall be secured only by the revenues of the Market and not by mortgage of the Market itself. *Wyatt v. State Roads Commission*, 175 Md. 258, 1 A. 2d 619. Plaintiffs contend, on the authority of *Mayor, etc., of Baltimore v. Gill*, 31 Md. 375, as distinguished in the *Wyatt* case, that within the meaning of such constitutional requirements, a pledge of existing revenue-producing property is undistinguishable from creation of a debt. The Authority disputes this contention and says that if the existing market now were, or before the fire had been, producing revenue, the legislature could direct it to be turned over by the City to the Authority without compensation, and the revenue of the new Market, including the existing market, could be pledged to secure the Authority's bonds issued to construct the new Market. We need not decide between these opposing contentions. For present purposes we shall assume that plaintiffs' contention is correct. On this assumption plaintiffs' contention is not in point, because (*a*) the existing market has not been revenue-producing but has been operated at a loss, and (*b*) it is

not to be turned over to the Authority without compensation, but is to be sold for a presumably fair price.

Besides denying the constitutionality of the Act, plaintiffs assert that the Authority and the City have not complied with the Act in determining the purchase price of the existing market. The Act provides that in so doing they "shall take into consideration the original cost of the existing market, reasonable depreciation, reproduction cost, revenues, cost of operation and maintenance, and all other available information relating thereto." Plaintiffs say original cost, reproduction cost and depreciation were not actually taken into consideration at all. The testimony is that original cost is unknown, no one would think of reproducing the existing market and, beyond giving consideration to the fact that reproduction was impracticable, consideration could not be given to reproduction cost. In the absence of original cost or reproduction cost or some other cost or value base, a separate estimate of depreciation is impossible. Consideration was given to the fact that revenues were insufficient to pay the cost of operation. As the purchase price was tentatively determined before the fire and has not yet been finally determined between the Authority and the City, and all financial and business arrangements regarding the Market project are in an inchoate state, we seriously doubt whether at this time any question regarding the purchase price is properly before us. At most we can only express an opinion on the evidence before us. If we ascribe to original cost and reproduction cost as much evidentiary weight as has ever been ascribed to them in a proper case, we think on the evidence that they can throw no more light on a valuation of Lexington Market than they could on a valuation of the Pyramids or a Model-T Ford or any other antique. We find no evidence of arbitrary, unfair or otherwise unlawful action in (tentatively) determining the purchase price.

The City since its incorporation has had power to "erect and regulate markets", (Acts of 1796, ch. 68);

to "lease, sell or dispose of the stalls and stands in any market, in any manner, and for any term they may think proper", (Public Local Code of 1860, Art. 4, sec. 638; *Rose v. Mayor, etc. of Baltimore,* 51 Md. 256, 269, 34 Am. Rep. 307) ; "To erect, regulate, control and maintain markets and stalls * * * and to regulate and control the sale of all goods, wares, merchandise and other articles therein. To lease, sell or dispose of any stalls or stands in any market, in such manner and upon such terms as it may think proper." [Baltimore City Charter, 1938 ed., sec. 6(15)] ; "to erect, control and maintain markets; to regulate and control the sale of all articles therein; and to lease or otherwise dispose of stalls therein." Baltimore City charter, 1946 ed., sec. 6(17). The title of the City to its streets and other property and places specified is inalienable (sec. 159, formerly 7), but it may grant franchises in public property or places so specified, on terms specified (sec. 159, formerly 8), and may dispose of "any building or parcel of land no longer needed for public use" (sec. 169). See *Mayor & City Council of Baltimore v. Canton Co.,* 186 Md. 618, 630, 47 A. 2d 775. The powers granted to the City before the Home-Rule Amendment, set forth in Art. 4, sec. 6, P. L. L., "may be extended, modified, amended or repealed by the General Assembly." Constitution, Art. 11A, sec. 2. No public local law shall be enacted by the General Assembly on any subject covered by express powers granted as above provided [in the Home Rule Amendment]. Art 11A, sec. 4.

It is not necessary to follow all the ramifications of plaintiffs' contentions regarding the Home Rule Amendment. Only within the limits of the express powers granted to the City by Art. 4, sec. 6, was the General Assembly prevented from passing a public local law. The Assembly alone could [1] enlarge, diminish or change the express powers of the City and [2] pass local legislation not within the express powers of the City. *Denhard v. Mayor and City Council of Baltimore,* 167 Md. 416, 419, 173 A. 267. The present Act is within

one or both of these powers reserved to the General Assembly. It enlarges the powers of the City by empowering it to sell the market to the Authority, not because the market is "no longer needed for public use", but because it can best be put to public use by another public corporation, which is an instrumentality of the City and can reconstruct the Market on a self-liquidating basis without pledging the City's credit. Before the Act the City had no such power, because the Authority or the like of it did not exist. If the Act is not only a grant of power to the City, but may also be considered local legislation, it is an exercise of legislative power not delegated to the City but reserved to the State.

Nor need we pursue plaintiffs' arguments (*a*) that the City under its "police power" [Charter, sec. 6(23)], could issue its revenue bonds, not to constitute a debt of the City, and generally do everything else (except possibly, plaintiffs say, to make the bonds exempt from taxation, *Jones v. Broening*, 135 Md. 237, 108 A. 785) that the Act empowers the Authority to do and (*b*) that certain provisions of the Act are not in conformity with provisions of the City charter relating to streets, franchises, disposition of property, and other matters. Whether particular transactions with the Authority are subject to particular charter provisions applicable to private persons or corporations are questions of construction, which can be dealt with if and when they arise. If a particular charter provision is applicable to the Authority, it must be complied with; if it is repealed *pro tanto* and therefore is not applicable to the Authority, it need not be complied with. In the latter event the Act enlarges the City's powers by empowering it to engage in some transaction with the Authority, unrestricted by some charter provision. On the other hand, if for present purposes we should make the difficult assumption that the City already has power to do all that the Authority is empowered to do, this assumption would have no relation to the constitutionality of the Act. If the legislature gives the City the choice of seeking an end

(*a*) by itself or (*b*) through the instrumentality of a second public corporation, it is not the province of the courts to say that two alternatives are unnecessary and the second is for that reason unconstitutional.

After holding the Act constitutional, Judge Sherbow by declaratory decree (*a*) held that all preexisting rights of stall-holders in the burned part of the market—as "owners", tenants, sub-lessors, occupants or otherwise—had been "burned out", and (*b*) reserved all questions as to any such rights in the unburned part of the market. Plaintiffs contend that the rights of "owners", and somehow of others, continue during the "existence" of the *market* (*Rose v. Mayor, etc., of Baltimore,* 51 Md. 256, 270, 34 Am. Rep. 307), and, though they terminate upon abandonment of the market by the City and use of the land for other purposes, *Liberto v. Mayor and City Council of Baltimore,* 180 Md. 105, 111-112, 23 A. 2d 43, do not terminate upon abandonment of the market building, only to be replaced by another better building, to be used for the same purposes, through a new instrumentality, the Authority. The Authority denies any such distinctions between the market and the market building or between the burned and unburned parts of the market, and insists that the court should have declared that all preexisting rights of stall-holders, in the burned or unburned parts of the market, had terminated. It is not clear just how any of the parties construe the new preemptive right of "tenants" under section 7 of the Act, *e. g.,* whether it is an enforceable legal right or only a "pious wish", and whether it is a right—or hope—of occupants to the exclusion of "owners" and sublessors, or *vice versa.* However section 7 is construed, obviously it may be so satisfactorily administered that no controversy will ever arise between the Authority and stall-holders. The nearest to a definite controversy that developed at the argument was the question of relative rights, old or new, of different plaintiffs, *i. e.,* occupants on the one hand and "owners" and sublessors on the other. Such an issue was foreshadowed fifty years ago, *Pfefferling v.*

*Baltimore City,* 88 Md. 475, 41 A. 778, but has never reached a decision. It is said that plaintiffs included rep-- resentatives of practically every known class of claimants of market rights. This statement does not define any "controversy" presented for decision—and does not even exclude possibility of other and different classes of claimants. Though the public history and present condi-- tions of Lexington Market and other markets is matter of common knowledge in Baltimore, records and information as to private rights were found meagre ninety years ago, *Rose v. Mayor, etc., of Baltimore, supra,* and are even more meagre now.

The purpose of the Declaratory Judgment Act, Code 1939, Art. 31A, § 1 et seq., is to terminate controversy, not to begin it. The act improves the administration of justice by anticipating and expediting decision of controversies, not by anticipating or fomenting controversy. The court is expressly authorized to refuse to render a declaratory judgment where such judgment would not terminate the controversy. Art. 31A, sec. 6. In the instant case we think the court should have refused. *Staley v. Safe Deposit & Trust Co.,* 189 Md. 447, 56 A. 2d 144; *Fallin v. Mayor and City Council of Baltimore,* 193 Md. 554, 67 A. 2d 256. The decree will be modified by striking out paragraphs 8 and 9, relating to rights or claims of rights in the burned and unburned parts of the market.

> *Decree modified and, as modified, affirmed, costs to be paid by the Lexington Market Authority.*