McKELDIN, GOVERNOR, ET AL. *v.* STEEDMAN
(Two Appeals in One Record)

[No. 35, October Term, 1953 (Adv.).]

*Decided July 2, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*J. Edgar Harvey, Deputy Attorney General,* and *Ambrose T. Hartman, Assistant Attorney General,* with whom was *Edward D. E. Rollins, Attorney General,* on the brief, for the appellants.

*Harry J. Green* and *John J. Ghingher, Jr.,* with whom were *Leonard Weinberg* and *Weinberg & Green* on the brief, for the appellee.

SOBELOFF, C. J., delivered the opinion of the Court.

A taxpayer is here seeking an adjudication as to the validity of Chapter 780 of the Acts of the General Assembly of 1953. This measure, known as the "General Construction Loan of 1953", authorizes the Board of Public Works to create a debt in the sum of $15,040,950, and provides for the issuance of bonds to be discharged according to what is known as the serial annuity plan within fifteen years.

Section 8 of the Act directs the levy of a state tax at a rate to be determined annually by the Board of Public Works, said tax to be imposed by the governing bodies of the counties and Baltimore City. It is as follows:

> "SEC. 8. *And be it further enacted,* That until all of the interest on and principal of any certificates issued under this Act have been paid in full, there is hereby levied and imposed an annual State tax on each $100 of assessable

property at the rate to be determined in the following manner: on or before December 1, 1953, and on or before December 1 in each calendar year thereafter, the Board of Public Works shall certify to the governing bodies of each of the Counties and Baltimore City the rate of State tax on each $100 of assessable property necessary to produce revenue to meet all interest and principal which will be payable to the close of the next ensuing calendar year on all certificates theretofore issued or theretofore authorized by resolution of the Board of Public Works to be issued, and the governing bodies of each of the Counties and Baltimore City shall forthwith levy and collect such tax at such rate.

All matters committed by this act to the discretion of the Board of Public Works shall be determined by a majority of said Board."

This section is orthodox in form. It in fact follows the language customarily employed in loan authorizations to comply with the requirements of Sec. 34 of Art. III of the Constitution of Maryland, which is as follows:

"Sec. 34. No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; and the taxes laid for this purpose shall not be repealed or applied to any other object until the said debt and interest thereon shall be fully discharged. The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual, association or corporation; nor shall the General Assembly have the power in any mode to involve the State in

the construction of works of internal improvements, nor in granting any aid thereto which shall involve the faith or credit of the State; nor make any appropriation therefor, except in aid of the Construction of works of internal improvement in the counties of St. Mary's, Charles and Calvert, which have had no direct advantage from such works as have been heretofore aided by the State; and provided that such aid, advances or appropriations shall not exceed in the aggregate the sum of five hundred thousand dollars. And they shall not use or appropriate the proceeds of the internal improvement companies, or of the State tax, now levied, or which may hereafter be levied, to pay off the public debt (or) to any other purpose until the interest and debt are fully paid or the sinking fund shall be equal to the amount of the outstanding debt; but the General Assembly may, without laying a tax, borrow an amount never to exceed fifty thousand dollars to meet temporary deficiencies in the Treasury, and may contract debts to any amount that may be necessary for the defense of the State. And provided further that nothing in this section shall be construed to prohibit the raising of funds for the purpose of aiding or compensating in such manner or way as the General Assembly of the State shall deem proper, those citizens of the State who have served, with honor, their Country and State in time of war; provided, however, that such action of the General Assembly shall be effective only when submitted to and approved by a vote of the people of the State at the General Election next following the enactment of such legislation."

Sec. 9 of Chapter 780, however, adds a provision new in the history of loan authorizations in this state. It reads:

"Sec. 9. And be it further enacted, that the state tax imposed in the preceding section shall not be levied or collected except in the event that funds sufficient to make the payments of interest and principal on the Certificates of Indebtedness issued under the provisions of this Act shall not be present and available as in this section required. In submitting his budget program to the General Assembly in each and every year pursuant to the provisions of Section 52 of Article 3 of the Constitution of Maryland, the Governor shall place therein an item covering the required payments for the following fiscal year of the principal and interest due on the Certificates of Indebtedness issued under this Act. Said funds shall be taken from the General funds of this State and shall be paid over for the payment of the principal and interest on the Certificate of Indebtedness issued under this Act during such fiscal year. No levy or partial levy shall be made of the taxes imposed under the preceding section of this act except in the event that funds are not present and available for the payment of said principal and interest as required in this section."

The bill of complaint alleges that the Board of Public Works has approved a request of the State Board of Education to expend $230,000 from the larger aggregate for the acquisition of additional land for Coppin State Teachers' College, as purportedly authorized by the Act, pending issuance and sale of the bonds, repayment to the State Treasury to be made out of the proceeds when realized. The complainant alleges that "all or part" of the Act, and the action based upon it, are illegal, unconstitutional and void.

First, it is charged that the Act is violative of Art. III, Sec. 29 of the Constitution of Maryland because its title is inadequate, vague and misleading in that

it fails to disclose that Section 9 purports under certain circumstances to require use of general funds to pay the interest on and principal of the bonds to be issued, rather than the levy of a tax in the manner required by Art. III, Sec. 34.

Secondly, it is asserted that the challenged measure is in violation of Section 34 itself in that, while purporting in Section 8 to require the levy of a tax in connection with the creation of a State debt, Section 9 in effect nullifies the tax for which Section 8 provides. The contention is that by directing that general funds be used to pay off the bonds without levying a tax to raise such funds, the mandate of Section 34, above quoted, is disregarded.

A third ground of attack is that the Act violates Section 52 (8) (b) of Art. III of the State Constitution, in that it constitutes a supplementary appropriation bill which, while purporting in Section 8 to levy a tax to provide revenue to repay the appropriation, nevertheless in Section 9 directs the use of general funds for this purpose. The language of Section 52 (8) is as follows:

"Sec. 52. (8) Supplementary Appropriation Bill. Neither House shall consider other appropriations until the Budget Bill has been finally acted upon by both Houses, and no such other appropriation shall be valid except in accordance with the provisions following: (a) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called herein a Supplementary Appropriation Bill; (b) Each Supplementary Appropriation Bill shall provide the revenue necessary to pay the appropriation thereby made [by] a tax, direct or indirect, to be levied and collected as shall be directed in said bill; (c) No Supplementary Appropriation Bill shall become law unless it be passed in each House by a vote of a majority of the whole

number of the members elected, and the yeas and nays recorded on its final passage; (d) Each Supplementary Appropriation Bill shall be presented to the Governor of the State as provided in Section 17 of Article 2 of the Constitution and thereafter all the provisions of said section shall apply."

Finally, the contention is made that Section 9 is an integral part of the Act, inseparable from it, and that as Section 9 is void the entire act must fall. A declaration of the invalidity of the Act is sought and an injunction is prayed to prevent any action under its authority.

On the appellants' demurrer to the bill the Circuit Court No. 2 of Baltimore City, after argument, decreed that Section 9 is unconstitutional, but that the rest of the Act is valid. An appeal and a cross-appeal followed.

## I.

To understand the interplay of the various sections of the Constitution here involved, it is necessary to examine our budgetary system as a whole and to consider the events which led to its adoption. In common with other states of the Union, Maryland less than four decades ago had no orderly system of planned public expenditures. Appropriations for various purposes were made piece-meal by the General Assembly, each project receiving independent consideration without relation to other claims upon the public purse. In earlier times, when the range and scope of state activities were limited, this plainless procedure was not seriously objectionable, for it was nevertheless not impossible for members of the legislature to have a fairly clear grasp of the state's fiscal operations. Eventually, however, with the growth in the size and complexity of governmental programs and machinery, embarrassing deficits occurred. A particularly disturbing experience of this nature happened in the year 1915, when there was a deficit of $2,000,000 in the State Treasury. The gravity of the problem became widely recognized, and shortly after his in-

auguration Governor Harrington appointed a group which was designated the "Commission on Economy and Efficiency on a Budget System". Dr. Frank J. Goodnow, then President of the Johns Hopkins Uni-versity, was its chairman and among its distinguished members was Mr. F. Neal Parke, later a member of this Court.

In accordance with the Commission's proposals an executive budget system was adopted by constitutional amendment, ratified by the people in 1916. The heart of the scheme, as stated by the Goodnow Commission, is "to impose upon the Governor the sole responsibility * * * of presenting to the legislature a complete and comprehensive statement of the needs and resources of the State * * *; to make it impossible for the legisla-ture so to change the plans proposed by the Governor as to produce a deficit; but, to permit the legislature to make provision for any purpose not included in the Governor's plan on the condition that it provide for the revenue which the accomplishment of its pur-pose necessitates." See *"The Maryland Budget System", First Report of the Commission on the Administrative Organization of the State (1951);* and H. S. Miles, *"The Maryland Executive Budget System"* (1942).

By this Amendment, Article III, Sec. 52, the General Assembly is forbidden to appropriate any money except in accordance with its provisions. Every appropriation bill must be either a Budget Bill, or a Supplementary Appropriation Bill. Elaborately detailed directions are given for submission by the Governor to the General Assembly of a budget annually for the next ensuing fiscal year, and it is required to contain a complete plan of proposed expenditures and estimated revenues and the estimated surplus or deficit of revenues at the end of the preceding fiscal year.

Neither House may consider other appropriations until the Budget Bill, prepared by the Governor as above recited, has been finally acted upon by both Houses. To be valid each Supplementary Budget Bill is required

by Section 52 (8) to provide the necessary revenue to pay the appropriation thereby made "by a tax, direct or indirect, to be levied and collected as shall be directed in said bill." Items proposed by the Governor in his Budget Bill may be reduced or eliminated by the legislature, but no new item may be introduced by amendment to the Budget Bill; only a Supplementary Budget Bill is permitted to be used for this purpose and it must provide a tax to raise the necessary revenue. The constitutional objective, as revealed by these provisions, is two-fold: first, to prevent the possible disturbance of the balanced budget which the plan contemplated, and, second, to allow legislative additions to the executive budget if, and only if, the legislature is willing to assume the burden and responsibility of sponsoring the necessary taxes to finance its proposals for additional expenditures.

The carry out these objectives a series of well thought out controls is specified in Section 52 of Art. III. We note three references in Section 52 (the Budget Amendment) to Section 34 of Art. III, quoted above, which declares that no debt shall be contracted unless authorized by an irrepealable law requiring the collection of an annual tax or taxes sufficient to pay the interest and principal within fifteen years. These are as follows: First, Subsection (4) (d) of Section 52 requires the Governor to include in his Budget an estimate of the appropriation necessary "to pay and discharge the principal and interest of the debt of the State in conformity with Section 34 of Art. III of the Constitution. Second, by the explicit language of Subsection 52 (6) the General Assembly is forbidden to amend the Budget so as to effect the obligations of the State under Section 34 of Article III. And third, Subsection 52 (14), which provides that the Budget Amendment shall prevail over any inconsistent constitutional provision, nevertheless adds, "But nothing herein shall in any manner affect the provisions of Section 34 of Article III."

Among the states Maryland was a pioneer in inaugurating this system for controlling appropriations, and its example has been followed quite generally throughout the nation. It has been the most effective instrument (a) to curb "log-rolling" for particular appropriations by restricting the power of the legislature in the initiation of appropriations, and (b) to discourage proposals for new appropriations by insisting that a proponent shall embody in his proposal a specific provision for raising the necessary revenue.

If the sole reason for this insistence on the provision of a tax in every Supplemental Budget Bill were only to assure necessary revenue to cover the authorized expenditure, there might be room for an argument, like that made on behalf of the appellant, that the "presence and availability" of funds from whatever source derived is sufficient. Even from this point of view the matter would be highly debatable because of the inherent uncertainties of the situation, for "presence and availability" is determinable only after the expiration of the year for which the funds are required, and it is then too late to levy a tax for that year.

This problem, however, we need not explore, for the firm command of Section 52 that a tax be provided in the Supplemental Budget Bill rests upon another and perhaps more compelling reason. An important, if not the supremely important, reason for the provision is that it is the constitutional design to assure that the fiscal requirements of the State, as fixed in the Budget prepared by the Governor and passed by the General Assembly, shall not be enlarged unless a tax to meet the increased need is incorporated in the proposal as an integral part of it. The key idea is that legislators will be less facile in passing Supplemental Appropriation bills if they must in the same act assume the uncongenial task of directing a specific tax. Where the item originates with the Governor in his Budget estimate, his is the responsibility of suggesting the means of balancing the expenditure with revenue; but where the

item originates in a Supplemental Budget Bill the legislature must find and provide a specific tax for this purpose.

If the legislature is left free to appropriate without taxing then Supplemental Appropriation Bills offer an open door for the entry of the very evil the executive budget was designed to exclude. The clear insistence of Section 52 that the *onus* of imposing a tax shall go hand in hand with the granting of public monies is not based upon abstract political theory but is the result of the State's alarming experiences under the practice of legislatively-initiated appropriations which flourished without restraint before the Budget Amendment. The framers of that amendment made their intention plain. They were practical men who thought Section 52 (8) a necessary anchor to preserve the executive budget system.

The appellants concede that Chapter 780 is a Supplementary Appropriation Bill within the meaning of Section 52 (8) but maintain that Section 8 of Chapter 780 complies with the requirement for the collection of an annual tax sufficient to pay the indebtedness as it falls due. They further say that Section 9 does not impair the legal effectiveness of Section 8 even though Section 9 provides against collection of the tax required by Section 8 unless sufficient funds are not present and available from general funds which the Governor is directed to include in his annual budget in an amount sufficient to pay the installment of principal and interest on the bonds payable the following year.

However, the use of *general* funds to defray the supplemental appropriation is not what the Constitution contemplates or permits. Calling on the Governor, as Section 9 does, to cover the supplemental item by *general* funds is not what the Constitution allows. Section 9 evades and frustrates the constitutional mandate for the levy and collection of an annual tax for this purpose.

The earnest debate of counsel as to whether Section 9 relates to surplus funds only or all general funds

is inconclusive. If we grant for the sake of argument that Section 9 operates upon surplus funds only, it still evades the requirement of a tax to be provided in the Supplemental Appropriation law. If Section 9 be viewed as operating upon general funds, surplus and other, it diminishes the funds upon which the Governor may rely in balancing his budget. But even more significantly, the Section attempts to circumvent the critically important constitutional requirement by shifting from the legislature to the Governor the public *onus* of being charged with the necessity for an additional tax.

In *Bickel v. Nice,* 173 Md. 1, 192 A. 777, this Court upheld a loan act, containing provision for the levy of an annual tax, against attack on the ground that it permitted other sources to be used to pay the first installment before the levy could become effective. But the Court warned that "the constitutional requirement is mandatory and not to be evaded or relaxed to meet particular demands."

This Court held in *Dorsey v. Petrott,* 178 Md. 230, 13 A. 2d 630, that the Tidewater Fisheries Act of 1939 was not an appropriation act and therefore not exempt under the Budget Amendment from the referendum provisions of Art. XVI of the Constitution. Unlike that act, Chapter 780 is concededly an appropriation act. *Niles on Maryland Constitutional Law,* pp. 361, 362. What Judge Parke said in that case as to supplementary appropriation bills is enlightening here: "On the one hand the Budget Amendment makes it mandatory upon the executive to submit a budget which shall contain a complete plan of proposed expenditures and estimated revenues for the particular fiscal year to which it relates. Among other duties, he shall make any suggestion he conceives expedient as to methods for the reduction or increase of the State's revenue. On the other hand, the Amendment empowers the Legislature to enact such laws as shall not be inconsistent with the Budget Amendment as may be necessary and

proper to carry out its provisions. These two, as well as other provisions for which mandatory legislation is prescribed, as, for example, in the case of the payment of the principal and interest of the public debt, and the exaction of a particular tax to meet the appropriation made by a supplementary appropriation bill, irrefutably indicate that the Budget Amendment contemplates as an integral part the passage of revenue measures to raise the funds the appropriations require." Cf. *Wyatt v. State Road Commission,* 175 Md. 258, 1 A. 2d 619, which dealt with revenue bonds, but gave recognition to the above doctrine in such a case as we have here.

In other jurisdictions constitutional requirements similar to ours have been held mandatory. In Pennsylvania the Supreme Court has said, "The fact that other revenues of the township may be now, or in the future, available, and could be applied to cover the shortage in the sum provided by the tax is no answer to the complaint here made, in view of the mandatory requirements of the existing legislation." *Campbell v. Wilkins Township,* 273 Pa. 204, 116 A. 823, 824. The later Pennsylvania case of *Gemmill v. Calder,* 332 Pa. 281, 3 A. 2d 7, which, according to the Attorney General's argument, countenances a contrary rule, is in our opinion distinguishable on the ground that the loan there considered was self-liquidating, like that in the *Wyatt case, supra.*

The Supreme Court of Georgia declared that "no plan for otherwise raising funds for the purpose can be lawfully substituted." *Wilkins v. Waynesboro,* 116 Ga. 359, 42 S. E. 767, 768.

Similar decisions based upon constitutional provisions comparable to those of Maryland have been made in *Hatfield v. Jordan,* 183 Cal. 223, 190 P. 1030; *Veterans Welfare Board v. Jordan,* 189 Cal. 124, 208 P. 284, 22 A. L. R. 1515; *Allen v. Cromwell,* 203 Ky. 836, 263 S. W. 356; *State ex rel. State Capitol Comm. v. Clausen,* 134 Wash. 196, 235 P. 364.

In *43 Am. Jur. 292* (*Public Securities and Obligations,* § 27) the rule is stated in these words: "The weight of authority is to the effect that failure to comply with constitutional or statutory provisions requiring the levying by a political subdivision of a tax sufficient to pay the interest on and provide an annual sinking fund to discharge the principal of public securities and obligations created by the subdivision, at or before the incurring of the indebtedness, renders such securities and obligations void and unenforceable."

To the same effect is *1 Jones, Bonds and Bond Securities,* (4th Ed.) § 554: "* * * There are, however, some requirements in the nature of mandates in the constitutions of most of the states which can not be ignored. One of the chief provisions of this character is the prescription that at the time of incurring the debt to be evidenced by the bonds, the legislature shall provide ways and means for the repayment of the loan, or, as it is sometimes stated, shall provide for a tax to pay the principal and interest of the bonds. These provisions being mandatory, state bonds can not be validly issued unless they have been complied with. * * *"

We hold that Section 9 conflicts with and nullifies Section 8 of Chapter 780 and violates the Budget Amendment of the Constitution; therefore, Section 9 is void. We need not pass upon other constitutional arguments.

## II.

We now reach the question of the effect of the invalidity of Section 9 upon the rest of Chapter 780. Manifestly, without Section 9, the measure is coherent, complete and in the form traditionally used. It is pointed out, however, that Chapter 780 contains no severability clause, and we are called upon to consider and decide whether from everything before us a legislative intent can fairly be gathered to make the enactment operative in the absence of Section 9. The inclusion of a separability clause would have been a helpful indication of legislative intent, but such a clause is not indispensable if the requisite intent may be otherwise found.

There is first the rule consistently applied in this State that "where a part of a statute may be clearly void and yet the remainder will carry out the legislative purpose, the unobjectionable part will be enforced." *Robey v. Broersma,* 181 Md. 325, 344, 26 A. 2d 820, 29 A. 2d 827, 831, 146 A. L. R. 687; *Compensation Board v. Albrecht,* 183 Md. 87, 96, 36 A. 2d 666; *Creaghan v. Mayor and City Council of Baltimore,* 132 Md. 442, 104 A. 180; *Welch v. Coglan,* 126 Md. 1, 9, 94 A. 384. And this Court has held recently that this rule can be sufficient independently to save the valid portion of the Act. "That clause, [a severability clause] however, * * * adds nothing to the general rule that courts try to uphold all parts of an act which can be put in force, even though other parts are invalid." *Bell v. Prince George's County,* 195 Md. 21, 32, 72 A. 2d 746, 751.

In the present instance we have in addition to the general rule above stated the legislative declaration that levy shall be made under Section 8 "in the event funds are not present and available for the payment of said principal and interest as required in this section [9]". This is an indication that further fortifies the application of the general rule, for if it were the intention of the General Assembly to insist on Section 9 or nothing this formula would not have been used and Section 8 would have been omitted entirely.

We hold, therefore, that Section 9 is separable and its invalidity does not affect the remaining sections of Chapter 780.

With Section 9 expunged the title of the Act is accurately descriptive and unexceptionable.

For these reasons the decree of the lower court will be affirmed.

*Decree affirmed with costs.*