SECRETARY OF TRANSPORTATION OF MARYLAND
*v.* MANCUSO ET UX.

[No. 7 (Adv.), September Term, 1976.]

*Decided June 24, 1976.*

82

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES and LEVINE, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals and JAMES C. MORTON, JR., Associate Judge of the Court of Special Appeals, specially assigned.

*J. Michael McWilliams, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Thomas G. Peter, Assistant Attorney General,* on the brief, for appellant.

*Thomas E. Plank* and *Roger D. Redden,* with whom was *W. Gar Richlin* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court.

The Secretary of the Maryland Department of Transportation (the Secretary) has appealed from a decree of the Circuit Court for Anne Arundel County which declared that the Department's Consolidated Transportation Bonds, Series 1976 (the Bonds), whose last serial principal maturity under the Secretary's resolution authorizing issuance of the Bonds was later than 15 years from the date of issue, constituted "debt" within the meaning of § 34 of Article III of the Constitution of Maryland. Since § 34 requires that any "debt" contracted by the General Assembly must be discharged within 15 years from the time it was incurred, the decree declared that the Secretary's resolution authorizing issuance of the Bonds was illegal, and it enjoined him from seeking approval for their sale.

Maryland Code (1957 Ed., 1967 Repl. Vol., 1975 Cum. Supp.), Article 94A, §§ 1 to 11A, inclusive, authorizes issuance of the Bonds for the purpose of financing transportation facilities. Section 9 (a) levies and imposes an "annual tax" for the payment of the principal of and interest on the Bonds, consisting of existing excise taxes on motor vehicle fuel and certificates of title, and certain corporate taxes. A sinking fund is established by § 9 (b) into which the proceeds of these taxes are required to be deposited; § 9 (c) provides that the taxes imposed and the proceeds thereof are "irrevocably pledged to the payment of the principal of and interest on the bonds . . . and no portion of the tax . . . shall be repealed, diminished or applied to any other purpose until such bonds and the interest thereon shall have become due and fully paid, or until adequate and complete provision for such payment shall have been made." Section 9 (d) provides that the Bonds do not constitute a debt or pledge of the State's faith and credit, "but shall be payable as to both principal and interest solely from the proceeds of the tax and other revenues levied, imposed, pledged or made available for such purpose."

In the Secretary's resolution authorizing issuance of the Bonds, the department covenanted that should the monies in

the sinking fund be insufficient to meet debt service requirements, it would "make appropriate requests through the executive budget process and before the General Assembly for such amount as may be necessary to make up such deficiency. . . ."

In concluding that the Bonds, if issued with maturities in excess of 15 years, would violate the provisions of § 34 of Article III of the Maryland Constitution, the lower court held that "the imposition, levy and irrevocable pledge of tax revenues make these bonds 'debt' . . . [in the constitutional sense contemplated by § 34] notwithstanding the statement in . . . [§ 9 (d)] of the Act that Consolidated Transportation Bonds 'are not and shall not be deemed to constitute a debt or pledge of the faith and credit of the State . . . .' "

Whether State bonds secured by a fund to which the State pursuant to statute has irrevocably pledged specific tax revenues constitutes a constitutional debt within the contemplation of § 34 is a question not heretofore considered by this Court. The Secretary points to the origin and history of § 34 and contends that the "debt" with which that constitutional provision is concerned is only that which the State is unconditionally obligated to repay. He maintains that if the source of debt service payment is expressly limited and not backed by the State's faith and credit, it is not a constitutional debt. The nature of the fund from which debt service on the Bonds is to be paid is not relevant, he claims, as long as it is specifically limited. The Secretary points out that the State has not promised to make payment on the Bonds from whatever source necessary, nor has it pledged its unlimited taxing power to the payment of the principal of and interest on the Bonds; rather it has pledged payment from a limited source only which includes specific, fixed rate taxes — the bondholders not being entitled to the proceeds from any increase in those taxes, and the State being under no legal obligation to increase the taxes, or to provide other funds, in the event that the pledged tax revenues prove insufficient to pay debt service. From this the Secretary reasons that there is no difference between the Consolidated Transportation Bonds and State revenue bonds

payable solely from non-tax revenues and not backed by the State's faith and credit, which the courts have held not to constitute "debt" under § 34.

Section 34 provides, in pertinent part:

> "No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; and the taxes laid for this purpose shall not be repealed or applied to any other object until the said debt and interest thereon shall be fully discharged .... The credit of the State shall not in any manner be given, or loaned to, or in aid of any individual association or corporation ...."

The wording of § 34 is virtually unchanged from its formulation in Article III, Section 22 of the Constitution of 1851. See Constitutional Convention Commission of Maryland, *Constitutional Revision Study Documents* 798-99 (1968). The debates of the Constitutional Convention of 1850 abound with references to the difficulty of marketing State bonds due to the State's poor credit condition at that time. This situation resulted from the State's extension of long-term credit to railroad and canal companies from 1820 to 1840, generally by means of the State's subscription to the securities of the companies. Payment of the subscriptions was often made by the transfer of long-term State bonds, issued upon the State's faith and credit. The companies usually sold the bonds at substantial discounts, thus in effect raising capital by pledging the State's credit. *Constitutional Convention Commission, Report* 214-15 (1967). Examples of long-term extensions of credit include Ch. 175 of the Laws of 1832 ($500,000 to railroad companies, with interest of $4^{1}/_{2}\%$, redeemable after 25 years); Ch. 241 of the Laws of 1834 ($3,000,000 to canal and railroad companies, with interest of 6%, redeemable after 35 years);

Ch. 395 of the Laws of 1835 ($8,000,000 to fund various railroad and canal projects, with interest of 6%, redeemable after 50 years); Ch. 302 of the Laws of 1837 ($500,000 to a railroad, with interest of 3%, redeemable after 52 years); Ch. 416 of the Laws of 1838 ($1,000,000 to canal companies, redeemable after 26 years); Ch. 20 of the Laws of 1839 ($663,000 to a railroad, with 6% interest, redeemable after 50 years).

By 1841 the State's financial security was threatened by the failure of the foregoing investments (or general revenues) to produce funds sufficient to pay the State's debt service requirements. Consequently the General Assembly imposed a series of taxes; their express purpose was to reduce the State debt. Chapter 23 of the Laws of 1841 (March Extra Session) provided for the first permanent statewide valuation of all real and personal property, and for the annual levying of a State property tax. This was followed eleven months later by an income tax (Ch. 325 of Laws of 1841). However, these proved insufficient, and consequently various excise taxes were imposed (Chs. 184, 187, 237, 280 of Laws of 1844). By 1848 these measures enabled the State to resume payment of current interest on the State debt; the State had been in arrears since 1842. *See generally* Hanna, *A Financial History Of Maryland (1789-1848)*, 70-125 in 25 Johns Hopkins University Historical Studies (1907). See also *Johns Hopkins Univ. v. Williams*, 199 Md. 382, 86 A. 2d 892 (1952); *Bonsal v. Yellott*, 100 Md. 481, 60 A. 593 (1905).

This history illustrates the fiscal concerns which resulted in the placement of the debt provision in the Constitution of 1851. It is a history replete with indiscriminate long-term financing, which resulted in the imposition of taxes whose express purpose was to ameliorate the prior abuses of the State's credit. It is thus clear that one of the purposes of the constitutional debt provision was to guard against future credit abuses by including within its purview any evidence of State indebtedness which is secured by its taxing power.

We are not persuaded by the Secretary's principal argument that the limitation of source of debt service

payment to exclude a pledge of the State's faith and credit removes the Bonds from the ambit of § 34. In *Mayor and City Council of Baltimore v. Gill,* 31 Md. 375 (1869), our predecessors held that the pledging of city-owned stock to secure a loan of one million dollars to the city, which in turn loaned the funds to a railroad, created a municipal debt within the meaning of then Article 11, § 7 of the Maryland Constitution, despite a stipulation that the lenders should look to the pledged stock alone for repayment, and that the city was not responsible even if the stock was insufficient.

Subsequent to *Gill,* there developed in Maryland the special fund doctrine, whereby revenue bonds secured by a limited source (usually the revenues of the project to be financed) and accompanied by a disclaimer that they constitute a State debt or obligate the State to levy or pledge taxes for their payment were held not to constitute "debt" within the meaning of § 34. The first such case, *Wyatt v. State Roads Comm.,* 175 Md. 258, 1 A. 2d 619 (1938) concerned bridge and tunnel construction bonds which were payable solely by tolls from the new facilities. In holding that these bonds did not constitute debt, Chief Judge Bond said for the Court (175 Md. at 265):

> ". . . Whatever elements of contract by the State, or debt, might be thought to exist in the arrangement, clearly, so far as the cost of construction is concerned, there is no contract to add to the burden of the taxpayers of the State present or future, none to pay anything out of taxes, and no debt incurred for which taxes could be levied. And that is the one kind of debt with which the constitutional clause deals. There is no novelty in the arrangement for self-paying construction. And it has long been settled that by use of the device no public debt within the meaning of constitutional safeguards and restrictions is incurred . . . ."

That the use of taxing authority could interfere with the vitality of this new doctrine was further indicated by the

Court in determining that the State's covenant to maintain and operate the facilities was not a constitutional "debt":

"... [A]n undertaking to pay undetermined, undeterminable, amounts of the cost of maintenance, repair, and operation in the future ... if it can be classed as containing an element of debt at all, is not one for which taxes to pay interest and principal, and to pay the principal completely in fifteen years, might be provided in a tax law. There can be no principal and interest in such a contract obligation. . . . However heavy the burden might possibly become, the contract to carry it is not such a debt with principal and interest as is dealt with by the Constitution . . . ." *Id.* at 268.

Thus *Wyatt* recognized inferentially that a present obligation of the State to levy taxes to pay principal and interest would constitute debt.

Later cases have expanded the special fund doctrine regarding revenue bonds, but none has applied the doctrine where the State's taxing authority was involved. *See Castle Farms, Etc. v. Lex. Mkt. Auth.*, 193 Md. 472, 67 A. 2d 490 (1949) (bonds not debt where secured by revenues from the facility to be funded); *Lerch v. Md. Port Authority*, 240 Md. 438, 214 A. 2d 761 (1965) (construction bonds not debt where payable solely from revenues of a proposed international trade center and secured by a mortgage thereon, despite appropriation of general funds to its construction). Indeed, in *Lacher v. Board of Trustees*, 243 Md. 500, 221 A. 2d 625 (1966), which held that dormitory construction bonds, payable solely from non-tax revenues from the new dormitories themselves and from increased charges for the use of existing dormitories, did not constitute debt, we said:

"... Maryland, in company with almost all jurisdictions that have considered the matter, holds that a State debt is not created by the issuance of bonds that are to be repaid from funds, *not taxes*, flowing solely from the facility to be created by the

proceeds of the bonds, as long as there is no pledge of existing State property and no pledge of income from existing State property . . . ." (citations omitted). *Id.* at 506-07. (emphasis added).

In limiting *Gill, supra,* to its holding that the creation of a lien on existing property to secure a borrower of money creates a debt by the borrower, we concluded:

". . . [T]he pledge of *non-tax* revenues from an existing facility towards the payment of revenue bonds issued by an agency of the State is not in itself the creation of a debt by the State." *Id.* at 508. (emphasis added).

The repeated emphasis on the non-tax nature of these special funds is a clear admonition against the use of the taxing power of the State in conjunction with this special fund exception to the constitutional debt limitation.

The cases from other jurisdictions cited by the parties in support of their respective positions generally depend upon the wording and scope of the debt restrictions contained in particular state constitutions. *See generally* 64 Am. Jur. 2d *Public Securities and Obligations,* §§ 6, 37 *et seq.* (1972). However, we find the experience of the State of Washington to be particularly relevant. Article 8 of the Washington Constitution requires voter approval of any law authorizing "debt" in excess of a certain amount. In 1949 the Washington Supreme Court held that limited obligation bonds secured by excise taxes on cigarettes were not debt, and therefore not subject to voter approval. See *Gruen v. Tax Commission,* 35 Wash. 2d 1, 211 P. 2d 651 (1949). However in 1963 the Washington court prospectively overruled *Gruen* by holding that bonds secured by the retail sales tax were "debt" in the constitutional sense. *See State ex rel. Washington State Finance Committee v. Martin,* 62 Wash. 2d 645, 384 P. 2d 833 (1963). Of the 522 million dollars in bonds issued between the two decisions, only 85 million were submitted to the voters for approval. 384 P. 2d at 837. The *Martin* court was

apologetically aware of *Gruen's* effect on the fiscal procedures of the state:

> ". . . [A] single excise on a lone commodity, limited and precise, placed in a special fund for the redemption of bonus bonds, could understandably appeal to the majority of the judges as not constituting a general obligation of the state and hence not violative of the state's debt limit; but the very logic of the holding authorized preemption of portions of the state's general revenues by each succeeding session of the legislature in the form of segregating future sales tax revenues into special funds. So it is that the reasoning of the minority in Gruen, clarified by time and events on the question of debt limitation, now seems more cogent and persuasive." 384 P. 2d at 837.

The Washington court recognized the utility of the special fund doctrine, but found that the true test of its application is

> "not what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge . . . any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state. Hence, we must take care that the employment of peripheral doctrines do not lead us away from the main point of the case. What is a debt of the State of Washington? Any obligation which must in law be paid from any taxes levied generally is, we think, a debt of the state. It matters little whether the tax be ad valorem or an excise." 384 P. 2d at 842-43.

In like manner, the use of the taxing authority for debt service payment for the Maryland Consolidated Transportation Bonds creates a constitutional "debt" of the State.

Finally, the Secretary's contention that § 34 reaches only those debts secured by the *ad valorem* property tax is plainly without merit. The Constitution does not contain any such limitation. Moreover, in light of the imposition of the other taxes of the 1840's to supplement the property tax and erase the State's fiscal embarrassment heretofore outlined, it is clear that the absence of this limitation was intentional.

*Decree affirmed; costs to be paid by appellant.*