**Gen. 117]** **117**

## PUBLIC FINANCE

### State Debt – Whether Subject to Appropriation Bonds and Leases Qualify as State "Debt" Within the Meaning of Article III, § 34 of the Maryland Constitution

November 16, 2022

*The Honorable Dereck E. Davis*
*Maryland State Treasurer*

Article III, Section 34 of the Maryland Constitution places certain restrictions on the State's ability to incur debt. That provision, broadly speaking, prohibits the General Assembly from contracting debt unless the debt is authorized by a law that provides for the collection of taxes "sufficient to pay the interest on such debt as it falls due" and unless the debt is discharged within fifteen years. Md. Const., Art. III, § 34. You have asked for an opinion of the Attorney General as to whether that constitutional provision prevents the State from either issuing bonds with a maturity longer than fifteen years or entering into lease agreements with an amortization period of longer than fifteen years if the payment of principal and interest on those bonds or leases is made subject to appropriation by the Legislature. In other words, is a bond or lease "debt" within the meaning of Article III, § 34, if payment is expressly contingent on the General Assembly's future decision to appropriate funds for payment on that bond or lease?

For the reasons discussed below, it is our opinion that subject-to-appropriation obligations are generally not debt in the constitutional sense and that, therefore, the restrictions contained in § 34 of Article III generally would not apply to those obligations. This is because the Court of Appeals of Maryland[1] has, in a series of cases decided over the course of nearly a century, taken an increasingly formalistic and narrow view of what the term "debt" means in § 34. Under those cases, the Court has so far concluded that obligations qualify as "debt" for purposes of the State's constitutional restrictions only if those obligations are secured by a pledge of either (1) tax revenue or (2) valuable,

---

[1] Last week, Maryland voters apparently voted to ratify a constitutional amendment that will change the name of the Court of Appeals to the Supreme Court of Maryland. But because the final steps for the adoption of that amendment have not yet been completed, *see* Md. Const., Art. XIV, § 1, we will continue to refer to the Court of Appeals by its soon-to-be obsolete name.

existing State property.    Subject-to-appropriation obligations, however, are not actually secured by either of those things.  Instead, they are typically secured only by a promise to *seek* appropriations, with no guarantee that any funds will in fact be appropriated for payment on the obligations.

Although the Court of Appeals has not yet considered the precise question you ask, courts in other states have applied similar reasoning to conclude that subject-to-appropriation obligations do not create constitutional debts.  Thus, under the framework used by the Court of Appeals up to this point for determining whether an obligation is debt under the State's Constitution, our view is that § 34's requirement that debts be discharged within fifteen years does not apply to bonds or leases when payment of those obligations is subject to appropriation by the Legislature.[2]

# I
# Background

## A.    *History of Maryland's Constitutional Debt Restrictions*

In the mid-19th century, Maryland, like many states, experienced a financial crisis caused by the State lending its credit to railroad and canal companies as they expanded westward. Const. Convention Comm'n, *Report of the Constitutional Convention Commission* 214 (1967) ("Constitutional Convention Report"); Richard Briffault, *Foreword: The Disfavored Constitution: State Fiscal Limits and State Constitutional Law*, 34 Rutgers L.J. 907, 917 (2003) ("Disfavored Constitution").  In many instances, the State transferred long-term State bonds to the companies and, in turn, the companies sold those bonds to raise capital.  Constitutional Convention Report, *supra*, at 214-15.  The

---

[2] We stress that, even though we have determined that subject-to-appropriation obligations are generally not "debt" within the meaning of § 34, we are speaking in generalities and cannot say unequivocally that *all* such obligations are not debt in the constitutional sense.  For example, if a subject-to-appropriation obligation were nonetheless secured by an interest in existing, valuable State property, that might raise a separate question.    Ultimately, each specific financing scheme that involves subject-to-appropriation bonds or non-appropriation clauses must be considered in light of its own provisions.  It also bears noting that, if a specific subject-to-appropriation obligation qualifies as constitutional debt, then all of § 34's restrictions apply.  This means that, in addition to providing for discharge within fifteen years, the law authorizing the debt must also provide for the collection of an annual tax sufficient to service the debt.

companies did not produce the revenue that they expected, however, so the State was left to repay those bonds. Dan Friedman, *The Maryland State Constitution: A Reference Guide* 116 (2006) ("Reference Guide"). To do so, the State had to levy hefty property taxes, which allowed Maryland to narrowly avoid financial ruin. Constitutional Convention Report, *supra*, at 215.

In response to that fiscal catastrophe, the State adopted, in 1851, the predecessor of what is now Article III, § 34 of the Maryland Constitution: Article III, § 22. *See Goldsborough v. Department of Transp.*, 279 Md. 36, 38 (1977) (tracing the history giving rise to § 34); Dan Friedman, *Magnificent Failure Revisited: Modern Maryland Constitutional Law from 1967 to 1998*, 58 Md. L. Rev. 528, 584-85 (1999) ("Magnificent Failure").

That Maryland provision—like the provisions of many other states—was adopted chiefly for "the protection of present and future taxpayers," to defend them against "ever-spiraling taxes necessary to finance a burgeoning debt." Reuven Mark Bisk, *State and Municipal Lease-Purchase Agreements: A Reassessment*, 7 Harv. J.L. & Pub. Pol'y 521, 526 (1984); *see also Forrer v. State*, 471 P.3d 569, 573-74 (Alaska 2020) (noting that, prior to 1840, "no state constitution contained a restriction on incurring state debt," but that many states revised their constitutions to include such restrictions after the Panic of 1837). Indeed, the debates of Maryland's Constitutional Convention of 1850 are rife with "references to the difficulty of marketing state bonds due to the depressed condition of the State's credit" and "elaborate expressions of regret that extraordinary taxes had to be levied in order to meet the debt."[3] Constitutional Convention Report, *supra*, at 215.

---

[3] Although not expressly articulated in the records of the Constitutional Convention's debates, some have suggested that state constitutional debt limitations may also be justified as "a means of reconciling the conflict between short-term and long-term interests that debt generates." Richard Briffault, *State and Local Finance*, *in* 3 *State Constitutions for the Twenty-First Century* 211, 216 (G. Alan Tarr & Robert F. Williams eds., 2006) ("State and Local Finance"). On the one hand, it may be appropriate to "spread the costs of [a capital] project over the project's useful life," given the long-term benefits that capital projects typically provide. *Id.* At the same time, "the ability to shift the costs into the future may also induce elected officials to incur too much debt," because those elected officials "can get the credit for the new project, but the blame for the additional taxes needed to pay off the debt will be borne by their successors." *Id.* at 217.

Like § 34 does today, § 22 precluded the State from taking on debt unless it was authorized by a law levying taxes sufficient to repay the obligation. Md. Const., Art. III, § 22 (1851). The provision also required that any debt be discharged within fifteen years, and that "the amount of debts so contracted and remaining unpaid shall never exceed one hundred thousand dollars." *Id.*

Voters ratified another State Constitution in 1864, which moved the debt provision to § 33 and eliminated the $100,000 debt ceiling. Md. Const., Art. III, § 33 (1864). Then, in 1867, the State adopted yet another constitution, which relocated the provision to Article III, § 34, where it resides today. But aside from relocating the debt restriction provision to § 34, the constitutional convention of 1867 made no substantive changes to the provision's debt limitations. *See* Magnificent Failure, *supra*, at 585 & nn.324, 325 (explaining the "slight" modifications to debt limitations).

The provision has been amended several times since 1867. One amendment in particular, ratified in 1972, is worth mentioning here. *See* 1972 Md. Laws, ch. 372 (ratified Nov. 7, 1972). As originally proposed by the General Assembly, the amendment would have "chang[ed] the taxing requirement for bills that create a State debt." *Id.* Instead of requiring that debt-enabling acts provide for the collection of taxes and the discharge of the debt within fifteen years, the amendment would have allowed the State to "incur indebtedness for any public purpose in the manner and upon the terms and conditions that the General Assembly prescribes by law." *Id.* The proposed amendment as originally introduced in the Legislature also explicitly stated that an obligation would not be considered debt unless the law authorizing it "include[d] an irrevocable pledge of the full faith and credit of the State." *Id.* A legislative committee struck that broad language in the proposed constitutional amendment, however. 66 *Opinions of the Attorney General* 234, 238 n.4 (1981) (noting that the original bill, which was amended in committee, "provide[d] for securing State debt by the general taxing power of the State, rather than by specific taxes").[4] As enacted, the amendment permitted that the taxes levied to service the debt are not to be collected "in the event that sufficient funds to pay the principal and interest on

---

[4] We have been unable to locate a bill file or any other historical documents related to the legislation that proposed this constitutional amendment, and we therefore do not know why the bill was amended in the way it was during the legislative process. For that reason, we hesitate to read much into the history. In any event, the final constitutional amendment as adopted has no real effect on our analysis below.

the debt are appropriated for th[at] purpose in the annual state budget." 1972 Md. Laws, ch. 372 (ratified Nov. 7, 1972).[5]

Thus, even with the language added by the 1972 amendment, § 34's debt restrictions today read essentially the same as they did in 1851:

> No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same; and the taxes laid for this purpose shall not be repealed or applied to any other object until the said debt and interest thereon shall be fully discharged. The annual tax or taxes required to be collected

---

[5] Over the years since § 34's adoption, voters have ratified other amendments to that section. In 1924, voters ratified an amendment that allowed the State to "rais[e] funds for the purpose of aiding or compensating . . . those citizens of the State who have served, with honor, their Country and State in time of War." 1924 Md. Laws, ch. 327 (ratified Nov. 4, 1924). Then, in 1960, voters approved an amendment that broadened the State's ability to borrow in order to "meet temporary deficiencies in the treasury" and to "make and sell short-term notes for temporary emergencies," so long as the revenue from those notes went only to "appropriations already made by the General Assembly." 1959 Md. Laws, ch. 234 (ratified Nov. 8, 1960). And, in 1976, voters ratified an amendment that removed the prohibition on appropriations to aid in works of internal improvement, 1976 Md. Laws, ch. 551 (ratified Nov. 2, 1976), a change apparently proposed so that the State could "take advantage of portions of the Federal Rail Service Continuance Subsidies Program as provided in the Regional Rail Reorganization Act of 1973," *Hearing on H.B. 2148 Before the Senate Budget & Taxation Comm.*, 1976 Leg., Reg. Sess., at 1 (Apr. 1976) (written testimony of the Maryland Department of Transportation). Finally, an amendment ratified in 1982 made changes to the portion of § 34 that addresses borrowing to meet "temporary deficiencies" or "temporary emergencies," and allowed the Treasurer to "issue short-term notes in anticipation of revenue including bond revenues." Reference Guide, *supra*, at 117; *see* 1982 Md. Laws, ch. 600 (ratified Nov. 2, 1982). The Legislature proposed the change in order to clarify an "ambiguity" in § 34 which "cast doubt on the constitutionality of borrowing on the credit of the State in anticipation of the receipt of non-tax revenues." *See* 63 *Opinions of the Attorney General* 95, 95 (1978) (discussing a bill proposing a similar constitutional amendment).

> shall not be collected in the event that sufficient funds to pay the principal and interest on the debt are appropriated for this purpose in the annual State budget.

Md. Const., Art. III, § 34.  As discussed in more detail below, "[t]he restrictions of Art. III, § 34 have, over time, forced the state to find creative ways to finance necessary improvements," and the courts have "assisted in this enterprise by stretching the words of restrictive constitutional provisions beyond their normal meanings."  Reference Guide, *supra*, at 118.

## B.    *General Obligation Debt and Subject-to-Appropriation Bonds*

The State's general obligation bonds are a clear example of how § 34's debt provisions work in practice.  These bonds are issued to fund, among other things, State-owned capital improvements and are backed by the full faith and credit of the State.  *See* Dep't of Legislative Servs., 4 *Legislative Handbook Series: Maryland's Budget Process* 86 (2018) ("Legislative Handbook"); *see also* Maryland State Treasurer, *General Obligation Bonds*, https://www.treasurer.state.md.us/debtmanagement/general-obligation-bonds.aspx (last visited Nov. 1, 2022).  Typically, the General Assembly authorizes debt in the Maryland Consolidated Capital Bond Loan—also known as the capital budget bill—which provides that:

> An annual tax is imposed on all assessable property in the State in rate and amount sufficient to pay the principal of and interest on the bonds, as and when due and until paid in full.  The principal shall be discharged within 15 years after the date of issue of the bonds.

*See, e.g.*, 2022 Md. Laws, ch. 344, § 1(4).  The Board of Public Works ("BPW") must then authorize the issuance of bonds. Legislative Handbook, *supra*, at 87.

Regarding the tax rate itself—which the capital budget bill does not specify—each year the Commission on State Debt recommends to the BPW a State property tax rate that will be sufficient to service the State's debts.  *See, e.g.*, Comm'n on State Debt, *Report to the Board of Public Works* 5 (2022) (recommending specific property tax rates); *see also* 39 *Opinions of the Attorney General* 272, 274-75 (1954).  Property tax revenue

is deposited into the State's Annuity Bond Fund, which provides the funds necessary to pay the principal and interest on the general obligation bonds. Legislative Handbook, *supra*, at 89-90.

By contrast, subject-to-appropriation bonds—the topic of your opinion request—differ from general obligation bonds in significant ways. These bonds, also called "appropriation risk bonds," *see, e.g.,* Letter from Richard E. Israel, Assistant Attorney General, to Sen. Barbara A. Hoffman, at 2 (Feb. 9, 2000) ("Hoffman Letter"), typically allow a state or local government to make payment on an obligation subject to appropriation and then specifically disclaim "any duty to make an annual appropriation," Disfavored Constitution, *supra*, at 920-21. Subject-to-appropriation obligations tend to "*assume* the regular appropriation of public funds to the authority issuing the debt," but that appropriation is not legally *required*. *Id.* at 922 (emphasis added).

Unlike general obligation bonds, then, subject-to-appropriation bonds are not backed by a pledge of the taxing power of the government issuing them, and the state or political subdivision pledges neither tax revenue nor existing, valuable property to secure the bonds. Rather, the issuing government simply agrees to seek the appropriation of sufficient funds to repay the obligation without actually promising to appropriate those funds year over year. *See, e.g.*, *Schowalter v. State*, 822 N.W.2d 292, 300 (Minn. 2012) (examining tobacco appropriation bonds and explaining that, "[a]lthough the Legislature has created a continuing appropriation to pay the principal and interest on the bonds on an annual basis, the bond documents make clear that the annual appropriation is subject to repeal, reduction, or unallotment").

Typically, if a non-appropriation occurs, the bondholders have no legal course of action against the state or political subdivision, because the government cannot be forced to pay or otherwise honor its obligations. *See, e.g.*, *id.* at 300-01 ("[T]he bondholders have no remedy for the State's failure to make principal or interest payments."). At most, the terms of a subject-to-appropriation financing scheme might provide the bondholder(s) with an interest in the property to be constructed or improved with the bond proceeds, *see, e.g.*, *State v. School Bd. of Sarasota County*, 561 So.2d 549, 551 (Fla. 1990), but the taxing power of the State is not implicated in any limited remedy for default that such an interest might provide. Because subject-to-appropriation bonds "present a slightly greater risk to investors," they typically carry a slightly higher interest rate than general

obligation bonds do, thus potentially costing the State more to issue. *See* Disfavored Constitution, *supra*, at 926. In addition, subject-to-appropriation bonds may also involve higher administrative and legal costs, *id.*, and may also have lower bond ratings, *see, e.g.*, Moody's Investors Serv., *US States and Territories Methodology* 34-36 (2022) (discussing "downward notches" for "contingent obligations," which include subject-to-appropriation bonds and leases).[6]

Lease agreements with non-appropriation clauses, about which you also asked, have similar characteristics.[7] It is our understanding that such leases, like subject-to-appropriation bonds, do not pledge tax revenue, and are not secured by existing, valuable property. *See, e.g.*, *Bruce v. Pikes Peak Library Dist.*, 155 P.3d 630, 633 (Colo. App. 2007) (examining leases that contained non-appropriation clauses providing that the library district was "not obligated to appropriate funds or make payments in future years"). Rather, if the funds necessary to make a lease payment are not appropriated, the lease agreement is generally subject to cancellation, and the government has no obligation to ensure that the lease payments are made. *See, e.g.*, *Haugland v. City of Bismarck*, 429 N.W.2d 449, 450-51 (N.D. 1988) (noting that, although tax revenue was expected to contribute to the lease payments in a municipal financing arrangement, tax revenue was not pledged and the leaseback was subject to cancellation if the city chose not to appropriate funds for lease payments).

## II
## Analysis

We now turn to your question: assuming that the State makes the payment of principal and interest on bonds or other obligations subject to appropriation, would the State violate § 34 of the State's

---

[6] Whether the use of subject-to-appropriation bonds is good policy is, of course, beyond the scope of this opinion. We express an opinion only about the permissibility of such financing mechanisms under the Constitution.

[7] Certain types of leases can arguably be viewed as paying off debt on an installment basis, akin in some ways to a mortgage, especially when the government will own title to the leased property when the lease ends. For example, the Nevada Attorney General's Office apparently questioned whether a lease for computer equipment created a constitutional public debt where the lease agreement provided a "schedule of base payments," the payment of which would result in the state's ownership of the equipment. *Business Comput. Rentals v. State Treasurer*, 953 P.2d 13, 14-15 (Nev. 1998) (per curiam).

Constitution if it were to issue bonds, or enter into leases, that mature or amortize over a span of more than fifteen years? Although those types of subject-to-appropriation obligations might seem like debt in the colloquial sense, the requirement in Article III, § 34 that a debt be discharged within fifteen years applies only to debt that is "debt" in the *constitutional* sense, as that term has been interpreted by the Maryland courts. Thus, if subject-to-appropriation bonds or lease terms do not qualify as debt within the meaning of the State's Constitution, they are not subject to the fifteen-year limitation in § 34.[8]

The key question, therefore, is whether making the payment of principal and interest on an obligation subject to appropriation means that obligation is not "debt" for purposes of § 34. Answering this question involves interpretation of the debt limitations contained in § 34 of the State's Constitution—in particular, the meaning of the word "debt," which the Constitution does not define. *Compare, e.g.*, Minn. Const., Art. XI, § 4 (defining "public debt"), *with* Md. Const., Art. III, § 34. Ordinarily, to interpret a provision of Maryland's Constitution, we would engage the same rules applicable to statutory interpretation. *Bernstein v. State*, 422 Md. 36, 43 (2011). But we are not operating in a vacuum here. The Court of Appeals has, on numerous occasions, interpreted § 34 and—as explained below—given the term "debt" a "highly specialized meaning[.]" Constitutional Convention Report, *supra*, at 220.

The text of § 34 precludes the General Assembly from authorizing State debt unless, in the same act enabling the debt, the General Assembly also provides for taxes sufficient to pay the debt and for the discharge of the debt within fifteen years. Md. Const., Art. III, § 34; *see also* 35 *Opinions of the Attorney General* 150, 151 (1950). Interpreted literally, the provision might mean that, any time the General Assembly seeks to borrow money in some form, it must also impose a tax to repay that money and ensure that the money is repaid within fifteen years. Indeed, "debt" is commonly understood as "a specific sum of money due by

---

[8] Of course, even if subject-to-appropriation bonds or lease terms were not constrained by § 34, they would still be subject to any statutory limitations that the General Assembly placed upon them. *Cf., e.g.*, Md. Code Ann., State Fin. & Proc. ("SFP") § 8-120(6) (permitting the BPW to allow bonds authorized by an enabling act to "mature in certain amounts at certain times . . . but not later than 15 years after their respective dates of issue"). We note, however, that you have not asked—and thus we do not consider—the extent to which any existing statutory provision would impose such limits.

agreement or otherwise," *Black's Law Dictionary* (11th ed. 2019), or "something owed," *Merriam-Webster Dictionary*, https://www.merriamwebster.com/dictionary/debt (last visited Nov. 1, 2022).

But, as detailed below, "[t]he words of the present Constitution . . . do not mean what they appear to say." Constitutional Convention Report, *supra*, at 221. Rather, despite the broad language of the provision, the Court of Appeals has interpreted the term "debt" in § 34 more narrowly, focusing on whether there is an actual pledge of tax revenue, or of existing, valuable State-owned property. In doing so, the Court of Appeals has taken an approach that examines the form of the financing scheme at issue and does not emphasize or give great weight to what the scheme might aim to do in practice.

## A.   *How the Court of Appeals Has Defined Debt*

In an early case addressing the meaning of debt in a constitutional context, the Court of Appeals seemed inclined toward a more literal and broad interpretation. *See Mayor & City Council of Baltimore v. Gill*, 31 Md. 375 (1869). That case—which was decided less than 25 years after the State financial crisis that led to the enactment of what is now Article III, § 34, *see* Constitutional Convention Report, *supra*, at 215—defined debt as "money due upon a contract, without reference to the question of the remedy for its collection." *Id.* at 390.[9] Working from this understanding of debt, the Court of Appeals held that Baltimore City created a constitutional debt when it enacted an ordinance that authorized the City to borrow money, the repayment of which was backed by a pledge of the City's shares of Baltimore and Ohio

---

[9] In *Gill*, the Court of Appeals was interpreting Article XI, § 7 of the State Constitution, which contains the limitations on Baltimore City's ability to take on debt. Though the restrictions themselves are a bit different—for instance, § 7 requires that the debt be "submitted to the legal voters of the City of Baltimore," and requires discharge of the debt within forty years rather than fifteen years, Md. Const., Art. XI, § 7—the judicial construction of the term "debt" is the same for both § 7 and § 34 of Article III, *see Hall v. Mayor & City Council of Baltimore*, 252 Md. 416, 424-25 (1969) (citing cases interpreting "debt" as used in § 34 to determine if a particular financing scheme created a debt for purposes of Art. XI, § 7). Such parity make sense, given that similar financial circumstances motivated municipal debt restrictions. *See id.* at 421 (noting that "[l]ocal debt increased very rapidly until the business crisis of 1873 brought about many municipal defaults caused by excessive and unwise debt" that, in many cases, were related to railroad financing).

Railroad Company stock. *Id.* at 391-92. In doing so, the Court of Appeals stressed that it was "dealing with substance, not with form," and suggested that "[i]t is the thing to be done, or sought to be accomplished, which must determine the question of the power [to enact] the Ordinance." *Id.* at 387. At bottom, *Gill* proceeded from the understanding that the "plain intent" of the constitutional debt provisions is to restrain the government from borrowing money "either upon the general credit of the city, or by a pledge of its revenues or assets." *Id.* at 390.

But any inclination that the Court of Appeals may at first have had toward a broad reading of § 34 has abated over the years as subsequent decisions have limited *Gill*'s holding and narrowed the meaning of debt under § 34. For instance, though initially there was a question as to whether *Gill* would "prevent the issuance of [so-called] revenue bonds in Maryland," Constitutional Convention Report, *supra*, at 218, it is now widely accepted that such bonds—e.g., bonds that are issued to generate funds to build or improve upon property or enterprise and for which the source of repayment is generally the revenue produced by that property or enterprise, *Secretary of Transp. v. Mancuso*, 278 Md. 81, 87 (1976)—do not create a constitutional debt.

One of the first cases to narrow the meaning of "debt" after *Gill* involved such revenue bonds. In examining the constitutionality of revenue bonds, the Court found it significant that the obligation was "not one in which property or income *already existing and owned by the State* is to be applied to repayment of the cost." *Wyatt v. Beall*, 175 Md. 258, 266 (1938) (emphasis added). The Court of Appeals distinguished *Gill*, observing that, there, "the pledge of the existing property was indistinguishable . . . from a pledge of credit," *Wyatt*, 175 Md. at 266, and thus held that revenue bonds "payable exclusively from tolls to be charged on the bridges and tunnels" constructed with or acquired by the bond proceeds did not create constitutional State debt, *id.* at 261, 265.

The Court of Appeals continued over the next couple of decades to enlarge the universe of revenue bonds (and, consequently, constrict the universe of constitutional debt). In one case, for example, the Court found that the bonds at issue—which would help finance improvements to a market, part of which had burned in a fire—were not "debt" when they were secured by the revenues of the existing market that was *not* revenue-producing prior to the improvements. *Castle Farms Dairy Stores v. Lexington Mkt. Auth.*, 193 Md. 472, 483 (1949). By stressing that the market

had been "operat[ing] at a loss," *id.*, the Court of Appeals distinguished *Gill*, which held that the "pledge of *valuable* property, or assets, held by the city," created a constitutional debt, *Gill*, 31 Md. at 389 (emphasis added). Similarly, in another case, the Court found that the bonds at issue were not debt when backed by the trade center to be built with their proceeds. *Lerch v. Maryland Port Auth.*, 240 Md. 438, 462 (1965). In *Lerch*, the Court emphasized the "majority view" that a debt is created when "existing valuable, income-producing property" is mortgaged as security for the payment of bonds used to finance a project and further explained that, in the case of the trade center, the State was not pledging any such existing property. *Id.* at 458. Instead, as the Court explained, if the State defaulted on the bonds and the trade center was sold for the benefit of the bondholders, "the State w[ould] lose nothing which it now has." *Id.* at 459; *see also id.* at 461-62 (discussing Wisconsin cases that were "based on the rationale that a municipality can walk away from the obligation none the poorer") (citation omitted).

Notably, the decision in *Lerch* relied to a significant degree on the specific historical circumstances leading to the adoption of § 34 to support a narrow interpretation of the word "debt" in that constitutional provision. The Court in *Lerch* explained that what is now § 34 was trained on a very specific "evil"—that it was meant "to curb the reckless and improvident investment of public funds in aid of railroads and canals, promoted by private corporations, organized primarily for profit to their stockholders, although they might eventually serve a public purpose." *Id.* at 453 (quoting *Johns Hopkins Univ. v. Williams*, 199 Md. 382, 398 (1952)). Thus, in the Court's view, the framers of § 34 could not have meant to "foreclose[] [a financing scheme] which was not and could not have been envisioned by them, and which had no relation whatever to the problems they were facing." *Id.* (quoting *Johns Hopkins*, 199 Md. at 399).

Then, in 1966, the Court of Appeals further extended this doctrine and explicitly gave it a name—the "special fund doctrine." That doctrine applies where "the obligation incurred is payable wholly out of the income and revenue of the enterprise which it finances," even including situations where the revenue derives partly from existing, already-revenue-producing State property. *Lacher v. Board of Trs. of State Colls.*, 243 Md. 500, 506-08 (1966); *see also* Md. Op. Att'y Gen. No. 84-021, 1984 WL 251388, at *4 (Sept. 5, 1984) (unpublished) (summarizing the special fund doctrine). Explaining that *Gill* had been "limited in its effect," the Court of Appeals held that "the pledge of future revenues by a State

agency from an *existing* enterprise or building to sweeten the pot available from the future revenues from the facility or building *to be constructed* from the proceeds of the revenue bonds does not amount to the creation of a debt by the state." *Lacher*, 243 Md. at 508-09 (emphases added).[10]

The Court of Appeals has, however, set *some* limitations on what qualifies as non-debt for purposes of § 34. Unlike courts in some other states,[11] the Court of Appeals has held that the special fund doctrine applies only to the use of *non*-tax revenues to secure an obligation and not to the "use of the taxing authority for debt service payment," *Mancuso*, 278 Md. at 89, 91, even if the debt is serviced from a specially defined fund that receives only tax revenue that is arguably related to the projects it finances. Thus, in *Mancuso*, the Court of Appeals held that a law that authorized the Maryland Department of Transportation ("MDOT") to issue bonds payable solely through the proceeds of excise taxes on fuel and title certificates, as well as certain corporate taxes, created a debt to which § 34 applied. *Id.* at 83, 91.

In reaching that conclusion, the court quoted a Washington State case that also involved the use of specifically defined tax revenue to service a debt, explaining that the "true test" of the special fund doctrine's application was:

> [N]ot what comes out of the fund, but what goes into it. If the revenues in it derive exclusively from the operation of the device or organ of government financed by the fund, as in the case of a toll bridge . . . any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities

---

[10] The plaintiffs in *Lacher* also argued that, because revenue from the existing buildings—revenue that was used for maintenance of the buildings—would be diverted to repayment of the bondholders, the scheme ultimately created a debt because the State would need to use tax revenue to maintain the buildings going forward. *Lacher*, 243 Md. at 509-10. The Court of Appeals rejected this argument, noting that the State was under no legal obligation to maintain its property. *Id.* at 511.

[11] *See* State and Local Finance, *supra*, at 218 for a discussion of the "extension" of the revenue bond concept to "bonds backed by taxes on activities that benefit from the project financed by the bond," and citations to cases approving such bonds.

> issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state.

*Id.* at 90 (alteration in original) (quoting *State ex rel. Washington State Fin. Comm. v. Martin*, 384 P.2d 833, 842 (Wash. 1963) (en banc)); Letter from Richard E. Israel, Assistant Attorney General, to Del. Howard P. Rawlings, at 4 (Aug. 26, 1997) (concluding that constitutional debt limitations likely applied to tax increment bonds to be serviced by certain property tax revenues).

### B. How to Apply the Court's Definition of "Debt" to Subject-to-Appropriation Obligations

Based on this history and the narrow view of constitutional debt that the Court of Appeals has taken, the type of subject-to-appropriation obligations about which you have asked do not appear to be constitutional debt—at least not as the Court of Appeals has defined the term so far. As the cases discussed above illustrate, the Maryland courts have taken a "formalistic" rather than a "practical" approach toward the definition of "debt" in § 34, *see* Hoffman Letter, *supra*, at 3, and have found § 34 to apply only when the State pledges tax revenue or existing, valuable property to secure its bonds or lease payments.[12] Because subject-to-appropriation obligations do not pledge either of those things, they do not appear to qualify as "debt" within the meaning of Article III, § 34. We elaborate on that conclusion below.

As an initial matter, the key cases finding that an obligation *did* qualify as "debt"—*Gill* and *Mancuso*—are distinguishable. The problem in *Gill* was that valuable government property was used as security for the bonds. 31 Md. at 389-90. Presumably, however, financing schemes that involve subject-to-appropriation obligations will either be backed only by the promise to seek appropriation of the money necessary to service the obligation or, at the most, by an interest in the not-yet-existing property or enterprise that the scheme seeks to finance. Although some of the language in *Gill* is perhaps broad enough to suggest that subject-to-appropriation bonds might qualify as debt, *see id.* at 390 (defining debt as "money due upon a contract, without reference to the question of the remedy for its collection"), the Court of Appeals has since made clear that *Gill* "has been limited in its effect . . . to its precise holding that a pledge or mortgage of existing

---

[12] We do not attempt to decide the limits of what "existing, valuable State-owned property" would include, as it is not necessary to answer the question asked.

governmental property creates or constitutes a debt," *Lacher*, 243 Md. at 508.

Similarly, subject-to-appropriation bonds are also different from the obligations at issue in *Mancuso*, which were backed by pledged tax revenues. 278 Md. at 83. To be sure, it might be that the funds used to pay the principal and interest on a subject-to-appropriation obligation will, once appropriated, contain revenue derived in part from various taxes. But such a scenario differs from *Mancuso* in that, there, the bonds issued by the MDOT were legally secured by a fund containing certain motor vehicle fuel and title excise tax revenues—which were "irrevocably pledged" for the payment of principal and interest on the bonds—and not merely the promise to seek an appropriation from that fund. *See id.* (bonds "shall be payable as to both principal and interest solely from the proceeds of the tax and other revenues levied, imposed, pledged, or made available for such purpose"). Indeed, the enabling law for the bonds levied the pledged taxes, *id.*, just as § 34 requires for the creation of debt. Thus, there was a direct line between the debt created and the taxes imposed and pledged to support that debt.

But, with subject-to-appropriation obligations, because the State has not actually pledged any tax revenue or existing property, the threat to future taxpayers—e.g., that their tax bills would increase in order to pay back the debt—is mitigated, at least to some degree. That is important because we know that the protection of future taxpayers was one of the central purposes that motivated the adoption of § 34. *See id.* at 86 (detailing past imposition of taxes to "ameliorate the prior abuses of the State's credit," and thus finding it "clear that one of the purposes of [§ 34] was to guard against future credit abuses by including within its purview any evidence of State indebtedness which is secured by its taxing power"). Because there is no imposition of a tax, and no direct recourse to tax revenue as a source of repayment, subject-to-appropriation bonds do not implicate the same abuse-of-credit concerns.

In addition, the rationales offered by the Court of Appeals in sustaining other financing schemes against § 34 challenges further support a conclusion that subject-to-appropriation obligations are not constitutional debt. For instance, in *Lerch*, the court reasoned that:

> The pledge of the [Trade] Center, when built, as security for the Authority's bonds will not jeopardize any property of the State which

> now exists. If there is a default in the bonds and the Center is sold for the benefit of the bondholders, the State will lose nothing which it now has. The future burden on the taxpayers will be no greater than if the Center had never been built.

240 Md. at 459. That justification applies with equal—if not greater—force to subject-to-appropriation obligations. If an obligation is backed only by the State's promise to seek the appropriation, at regular intervals, of the funds necessary to pay the principal and interest and nothing more, clearly no State property is in jeopardy. The State can, at least in theory, decline to appropriate the funds and "walk away from the obligation none the poorer." *Id.* at 462 (citation omitted).

Similarly, when considering whether the State's obligation to maintain property built with the proceeds of revenue bonds qualifies as constitutional debt, the Court of Appeals emphasized that, under those circumstances, the General Assembly was not "forced" to authorize any expenditures:

> The obligation of the State to maintain the buildings at the State Colleges in the future is exactly that it has to maintain any buildings it owns and that of any provident owner of property. It has not agreed with the bondholders or with anyone else to pay any amount in future years to maintain any building. *Whether it does maintain them depends on whether the Legislature appropriates the necessary funds, and it cannot be forced to authorize such expenditures. An obligation of this sort is not in our view a debt within the meaning of the Constitution.*

*Lacher*, 243 Md. at 511 (emphasis added).

In doing so, the Court appeared to draw a distinction in this context between a practical reason that the General Assembly might decide to appropriate funds as a result of a financing arrangement and a legal *obligation* to do so. Given that a similar distinction exists between subject-to-appropriation obligations (which the State might have a strong practical reason, but no legal obligation, to honor) and general obligation debt, it is our view the

Maryland courts would likely find that subject-to-appropriation obligations are generally not "debt" under Article III, § 34.

This conclusion that subject-to-appropriation obligations are not constitutional debt is consistent with prior advice from this Office, as well as the majority rule in other states. Our Office previously examined a "modified tax increment financing" scheme under which, rather than irrevocably pledging tax increment revenue toward repayment of the bonds, "the revenues representing the levy on the tax increment [we]re subject to annual appropriation." Hoffman Letter, *supra*, at 2. That letter concluded, consistent with our view here, that "in the absence of a legally enforceable obligation to pay debt service, the opinions of the Court of Appeals suggest that appropriation-risk bonds would not be considered debt" in the constitutional sense. *Id.* at 3.

In reaching that conclusion, we also looked to a Virginia case that examined a scheme to finance a parkway that involved bonds issued by a transportation commission, and for which a county agreed to pay the annual principal and interest from the county's general revenues. *Dykes v. Northern Va. Transp. Dist. Comm'n*, 411 S.E.2d 1, 3 (Va. 1991). The contract provided that "[t]he obligation of the County to make any payments . . . is contingent upon the appropriation for each fiscal year by the Board of Supervisors of the County of funds from which such payment can be made." *Id.* (alteration in original). The Supreme Court of Virginia ultimately concluded that no constitutional debt existed because the financing scheme "d[id] not impose any enforceable duty or liability on the County."[13] *Id.* at 10, *on reh'g*.

Indeed, the vast majority of other states to consider the issue have similarly held that subject-to-appropriation bonds, and leases containing non-appropriation clauses, are not constitutional debts.

---

[13] Initially, the Supreme Court of Virginia held that, in making payment on the obligation subject to appropriation (and not submitting the measure to the voters), the county and transportation commission were "impermissibly seek[ing] to accomplish indirectly what they c[ould] not do directly." *Dykes*, 411 S.E.2d at 5. One motivating factor in that decision was the county's recognition of "the importance of its fiscal integrity," and the "disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation." *Id.* Noting the county's assertion that "such a disaster would never be permitted to occur," the court found an implicit acknowledgement that "the bond issue would have the practical effect of a long-term debt binding the county." *Id.* Upon rehearing, however, a majority of the court reversed that initial decision. *Id.* at 10, *on reh'g*.

For example, the Supreme Court of Iowa has held that no constitutional debt was created when "[t]here [wa]s nothing in the agreements creating the notes and bonds that b[ound] the city to any particular future course of action." *Fults v. City of Coralville*, 666 N.W.2d 548, 557-58 (Iowa 2003). This was so even if the "practical effect" of the agreements was that the city would repay its obligations to avoid negative financial consequences. *Id.* Similarly, the Supreme Court of Florida has ruled that there was no constitutional debt where "[m]oney from several sources, including ad valorem taxation, will be used to make the annual facilities' lease payments," but "[i]f, in any year, a board does not appropriate the money to pay the lease, the board's obligations terminate without penalty and it cannot be compelled to make payments." *School Bd. of Sarasota County*, 561 So.2d at 551.[14]

We recognize that, even though there is no *legal* obligation to appropriate funds to satisfy a subject-to-appropriation obligation, there would be significant pressure on the State to do so (and thus significant pressure on the State to increase taxes if necessary to satisfy such an obligation). As the Department of Legislative Services has stated, "a cautious fiscal culture has evolved in Maryland," and "[h]aving earned a AAA bond rating from all three major rating agencies (Fitch, Moody's, and Standard & Poor's), the State makes few important decisions without considering the potential impact on that treasured status." Legislative Handbook, *supra*, at 2. For that reason, one might argue that, from a practical standpoint, the Legislature is extremely unlikely to risk the State's credit rating by declining to appropriate the necessary funds to

---

[14] *See also Lonegan v. State*, 819 A.2d 395, 402 (N.J. 2003) (accepting that there are "constitutionally significant differences between the Legislature being 'highly likely,' rather than being 'legally bound,' to repay its debts," and holding that "only debt that is legally enforceable against the State is subject to the Debt Limitation Clause"); *Fent v. Oklahoma Capitol Improvement Auth.*, 984 P.2d 200, 205, 208 (Okla. 1999) (per curiam) (financing scheme that involved "[a]t most . . . appropriation-risk or moral obligation bonds" did not create constitutional debt because there was "no legally enforceable contract between [the Legislature] and either [the Capitol Improvement Authority], the various agencies, etc. or the citizens of Oklahoma to make the anticipated appropriations necessary to retire the bonds"); *Wilson v. Kentucky Transp. Cabinet*, 884 S.W.2d 641, 642, 644 (Ky. 1994) (finding no constitutional debt created by road bonds issued for road construction projects where the funds to pay bondholders were subject to appropriation because "there [wa]s no legal obligation or debt which the courts c[ould] enforce against future generations," and because "[t]he distinction between debt as a legal obligation and any other type of financing is a real distinction").

service bonds that are subject to appropriation and that thus such bonds differ little in practice from general obligation bonds. *Cf.* Disfavored Constitution, *supra*, at 922-23 (noting that, though appropriation-backed bonds are "not considered debt under a strict legal definition, Standard & Poor's considers all appropriation-backed bonds of an issuer to be an obligation of that issuer and a failure to appropriate will result in a considerable credit deterioration for all types of debt issued by the defaulting government" (citation omitted)).

The Supreme Court of Alaska relied in part on a similar argument when invalidating, under Alaska's constitutional debt provision, legislation that created a state corporation authorized to issue subject-to-appropriation bonds to raise funds to pay off certain state obligations. *Forrer*, 471 P.3d at 573, 579, 593. Although that decision also relied on grounds that were unique to Alaska and would not be relevant in Maryland,[15] the court appeared to find some merit to the argument that the prospect of negative credit ratings would have essentially the same effect as requiring an appropriation, thus leaving no meaningful constitutional difference between subject-to-appropriation obligations and other forms of debt. *See id.* at 593 (concluding that the court "need not decide whether a potential credit downgrade alone suffices to create debt," but explicitly noting that, while the scheme might not *require* appropriations, in practice "legislatures would feel enormous pressure to appropriate funds due to the potential negative impact on Alaska's credit rating").

As discussed above, however, Maryland's Court of Appeals has so far taken a more "formalistic" approach to defining constitutional debt. Hoffman Letter, *supra*, at 3. In fact, the Court has expressly clarified that, despite the "broad language" of *Gill* suggesting that any action that could directly *or indirectly* lead to an increase in taxes might qualify as debt, "[t]he fact that action by the [government] may result in increased taxation does not necessarily mean that debt will be created." *Eberhart v. Mayor & City Council of Baltimore*, 291 Md. 92, 103 (1981). The Maryland

---

[15] *Forrer* involved a constitutional provision adopted in 1956—much later than Maryland's—and accompanied by a rich, detailed, and well-documented history that included discussion about the meaning of the word "debt." *See, e.g.*, *id.* at 588. Alaska's constitution also contains an explicit exemption from its debt restrictions for revenue bonds but not subject-to-appropriation bonds, *see* Alaska Const., Art. IX, § 11, and the Alaska court found that "the constitution's plain text draws a clear and meaningful distinction between the terms 'revenue' and 'appropriations,'" *Forrer*, 471 P.3d at 596-97.

courts have instead, as described above, tended to look to the form of the arrangement, including whether the State has *pledged* any tax revenue or any valuable, existing State property.

In our view, then, the Maryland courts would more likely find that "there are constitutionally significant differences between the Legislature being 'highly likely,' rather than being 'legally bound,' to repay its debts." *Lonegan*, 819 A.2d at 402. Indeed, that distinction is more than just a formal one: When the State has not actually *pledged* any tax revenues (or valuable existing property), the Legislature has more discretion to weigh the harm of defaulting on an obligation versus the harms that might be caused by honoring the obligation. *Cf. Wyatt*, 175 Md. at 267 (explaining that "[t]he [General] Assembly was given the chief part of the task of deciding questions of financial policy").

Thus, like many of the states that have considered this "pressure to appropriate" argument, we conclude that, while credit rating considerations are relevant to a legislative determination as to the wisdom of authorizing a particular transaction, *see Wilson*, 884 S.W.2d at 645-46, they do not create a constitutional debt. *Lonegan*, 819 A.2d at 402; *see also Fults*, 666 N.W.2d at 558 (explaining that, even if the "practical effect" of subject-to-appropriation obligations is that the government will repay its notes and bonds, this does not affect the analysis as long as the city "cannot be held legally responsible for the debt"); *Dykes*, 411 S.E.2d at 375 (reasoning that "[e]xpectations of bondholders, County officials, or bond rating agencies do not create County 'debt'"), *on reh'g*.

## C.  *Leases*

A final point about lease financing bears mentioning and provides an independent reason why leases containing subject-to-appropriation payment terms likely do not create constitutional debts. More specifically, in at least two cases, the Maryland courts have held that certain types of lease financing schemes—schemes that, as far as we know, did *not* contain non-appropriation clauses—were not subject to § 34's restrictions, based on the separate rationale that an agreement to pay rent "creates no debt until the time stipulated for the payment arises." *Hall v. Mayor & City Council of Baltimore*, 252 Md. 416, 424 (1969) (quotation and citation omitted) (so holding in case involving Article XI, § 7); *Eberhart*, 291 Md. at 107-08 (same); *see also Wyatt*, 175 Md. at 268 ("According to all decisions known to us, even if ascertained amounts are now agreed to be paid in the future, as, for instance,

rentals, this would not be the contracting of a debt in the constitutional sense."). This common law rule—which was in effect when § 34 came into being, *Hall*, 252 Md. at 423—reflected the view that "rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let," *id.* at 424 (quotation and citations omitted).

In *Hall* and *Eberhart*, the Court of Appeals held that the challenged leases did not create constitutional debt because they were "bona fide" leases, *Hall*, 252 Md. at 424-25—i.e., leases that constituted "economically balanced transactions" involving "the exchange of value for value," *Eberhart*, 291 Md. at 107-08. In both cases, the Court found it important that the rental payments represented the fair rental value of the properties being leased.[16] *See id.* at 107; *Hall*, 252 Md. at 427; *see also* 54 *Opinions of the Attorney General* 351, 352 & n.1 (1969) (suggesting that the legality of a sale-leaseback scheme depends on whether a court determines that the lease is a "bona fide lease transaction," and not "a subterfuge for a plan of financing the purchase of a facility" that would create a constitutional debt); Bisk, *supra*, at 531 & nn.55-56 (noting that "[c]ertain courts approving lease-purchase agreements without the benefit of a nonappropriation mechanism have relied heavily upon the reasonable and fair cost of rental payments under lease-purchasing," and citing Maryland cases).

We do not, however, need to decide the precise contours of what would constitute a "bona fide" lease here, as that was not the question that you asked. Rather, it is enough to say that, given that at least some lease arrangements are not constitutional debt in the first place under *Hall* and *Eberhart*, it is difficult to see how the addition of a term that makes payment of lease obligations subject to appropriation could transform such a "non-debt" into constitutional debt.

---

[16] The dissent in *Eberhart* is notable. Maintaining that the court must "examine the transaction . . . as a whole, not its individual parts," *Eberhart*, 291 Md. at 118 (Smith, J., dissenting), the dissent opined that "[s]tripped of all dross, trappings and camouflage, what we have here is a municipal asset which the City is to pledge as security for money advanced to it which it is to pay back over a thirty year period. That is a debt," *id.* at 123. Thus, according to the dissent, "the City's obligation to pay [wa]s not based upon the economic worth of the building, but [wa]s to pay not less than the sum necessary to cover the debt obligation." *Id.* at 124. But that rationale was not, of course, adopted by the majority.

Moreover, for decades Maryland has utilized installment sale and lease purchase arrangements to finance certain capital needs—primarily equipment and real property. *See* SFP §§ 8-401 through 8-407; *see also* Floor Report, House Comm. on Appropriations, S.B. 50, 1995 Leg., Reg. Sess. (noting that, for purposes of S.B. 50, "capital lease means financing equipment purchase or the purchase and improvement of real property"). Although the State must consider capital leases as "tax-supported debt" for purposes of debt affordability calculations, Legislative Handbook, *supra*, at 100, the statute provides explicitly that capital leases are "contingent on the availability of appropriated or other legally available funds," "may not be construed or deemed to be a debt of the State or a unit of State government," and "may not constitute a pledge of the full faith and credit and taxing power of the State or a unit of State government," SFP § 8-404. Of course, these legislative caveats by themselves do not guarantee constitutionality. *See Mancuso*, 278 Md. at 83, 91 (finding a bonding bill unconstitutional despite similar disclaimers). But given that the scheme remains unchallenged after close to thirty years[17] and that any challenge would have to contend with the "bona fide" lease precedent from the Court of Appeals, our sense is that the General Assembly's classification of capital leases as non-debt is correct.

In any event, to answer the question that you asked, it suffices to say that leases with subject-to-appropriation clauses or terms are likely not debt—at least not for purposes of § 34—and, therefore, there is likely no constitutional requirement that such leases amortize within fifteen years.

### III
### Concluson

In our opinion, the restrictions in Article III, § 34 of the State Constitution do not apply to bonds or leases when repayment of the obligations created by those bonds and leases is expressly made subject to appropriation by the Legislature. The Court of Appeals has so far found an obligation to be "debt" for purposes of § 34 only when the obligation is secured with tax revenue or when the State pledges existing, valuable property as security. Subject-to-

---

[17] In some cases, the fact that a state has long engaged in certain methods of public finance may influence the conclusion as to what does or does not constitute debt. *See, e.g.*, *Lonegan*, 819 A.2d at 407 ("We are unwilling to disrupt the State's financing mechanisms in the circumstances presented to us, and agree with the majority of state courts interpreting their own constitutions that the restrictions of the Debt Limitation Clause do not apply to appropriations-backed debt.").

appropriation obligations, however, neither pledge the State's tax revenue nor require that existing, valuable property be used as security. Therefore, in our view, the Constitution likely does not preclude the State from issuing bonds that take longer than fifteen years to mature, or leases that amortize over a period longer than fifteen years, if payment of the obligations created by those bonds and leases is made subject to appropriation by the General Assembly.

                                     Brian E. Frosh
                                     Attorney General of Maryland

                                     Sara Klemm
                                     Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice